No. 103,120

STATE OF KANSAS, *Appellee*, v. ANTONIO JERMAINE ARMSTRONG, *Appellant*.

(324 P.3d 1052)

Opinion filed May 23, 2014.

*Samuel D. Schirer*, of Kansas Appellant Defender Office, argued the cause, and *Shawn E. Minihan*, of the same office, was on the brief for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Antonio Jermaine Armstrong of one count of premeditated first-degree murder and one count of criminal possession of a firearm. On appeal, Armstrong raises six issues.

In addressing those issues, we first hold that Armstrong was not denied a fair trial because of prosecutorial misconduct, although two statements made by the prosecutor during closing argument exceeded the wide latitude allowed in arguing a case to a jury. Second, we hold the trial court did not commit clear error in failing to instruct the jury on unintentional but reckless second-degree murder because we are not firmly convinced the jury would have reached a different verdict had the instruction been given. Third, we reject Armstrong's claims that the trial court erred by (a) giving only one instruction on voluntary manslaughter rather than separately instructing the jury it should consider whether Armstrong acted in the heat of passion, upon a sudden quarrel, or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person or (b) defining only heat of passion and not the other options. Fourth, we hold that the trial

court did not err in finding that there was no factual support for Armstrong's motions for mistrial based on his allegations that (a) one juror had been inattentive and (b) two jurors had discussed his guilt during a court recess. Fifth, we hold the errors did not cumulatively deny Armstrong a fair trial. Finally, we hold the district court had jurisdiction to award restitution after judgment was pronounced at sentencing because the court indicated during the sentencing hearing that the proceeding would be continued for the determination of the restitution amount.

## FACTS AND PROCEDURAL BACKGROUND

The events leading to Armstrong's convictions occurred in Topeka on August 10, 2007, when James Earl Dyer, Jr., was shot to death at the home of Rhonda Shaw. Armstrong and three other individuals—Drake Kettler, Jr.; Kelvin Phillips, Jr.; and Corky A. Williams—were charged with and convicted of crimes related to Dyer's death. All four defendants appealed, and their individual appeals were argued the same day. For these related opinions, see *State v. Kettler*, 299 Kan. 448, 325 P.3d 1075 (2014); *State v. Phillips*, 299 Kan. 479, 325 P.3d 1095 (2014); and *State v. Williams*, 299 Kan. 509, 324 P.3d 1078 (2014).

In early 2009, all four codefendants were tried together, but the proceedings ended in a mistrial. Before the retrial, the court severed Armstrong's case from those of the other three codefendants. Armstrong's retrial occurred first, and while Armstrong's testimony from his retrial was introduced into evidence at the later joint retrial of Armstrong's codefendants, the jury in Armstrong's trial did not hear the accounts of Armstrong's codefendants. Nor did the jury hear from Shaw, who passed away before the trial. Nevertheless, the jury did hear the testimony of two individuals—Leonard Mun and Teri Johnson—who were in Shaw's house with Dyer on the day he was shot.

Johnson, who was Dyer's girlfriend, testified about the events leading up to the shooting. She began by telling the jury that she and Dyer had walked to a liquor store where they ran into Shaw and Mun. Johnson visited with Shaw, and it was agreed they would all go to Shaw's house. While Shaw shopped at the liquor store and

an adjoining smoke shop, Johnson started toward Shaw's car. Before Johnson got into the car, Phillips, whom Johnson knew, approached her and asked if she was "straight," meaning did she need to buy any drugs. Johnson told him she did not. She then got into Shaw's car, where Dyer and Mun were sitting. Phillips again approached her; he handed her his phone number and told her to call if she needed something.

After Shaw completed her shopping and Johnson, Dyer, Mun, and Shaw were driving away, Johnson looked behind her and saw Phillips and some other men running down the alley behind the liquor store and smoke shop. This was corroborated by surveillance camera recordings.

A short time after Shaw, Mun, Johnson, and Dyer arrived at Shaw's house, Shaw's home phone rang. Shaw answered the phone and said, "Yeah, yeah," and then passed the phone to Mun. According to Mun, no one was on the line, so he hung up. After the phone call, Shaw asked Dyer if he was "J.D.," and Dyer answered that he was.

A few minutes after the phone call, there was a knock at Shaw's front door. Mun went to the door, but before opening it he asked, "Who is it?" After a moment, the person on the other side of the door responded, "Little Man," which Mun recognized as Kettler's street name. Mun told the others who was at the door, and Dyer jumped up, left the room and went to the back of the house. Mun delayed opening the door because he had heard a rumor that Dyer had robbed Kettler's dope house and he thought there could be trouble. When Mun opened the door, he did not see anyone. Then he looked to the side of the house and saw Armstrong, Phillips, and Kettler. The three men ran past Mun and into the house where Phillips immediately got in Johnson's face asking, "Bitch, where is he at?" Johnson replied that she did not know what he was talking about, and Phillips and the others ran out of the house.

According to Mun, the three men went around the north side of the house and another man, Williams, approached and went around the south side of the house. Armstrong, Phillips, Kettler, and Williams returned to the front door after apparently realizing they could not get to the back of Shaw's house because of a fence.

Armstrong, Phillips, Kettler, and Williams walked past Mun, who remained outside the front door. Mun did not see a gun in anyone's hands. Johnson, however, testified that Kettler, Phillips, and Armstrong came back into the house, all with "guns in their hands." As the men came back into the house, Johnson got up and ran out of the house.

Mun knew that Phillips, Williams, Kettler, and Armstrong had found Dyer because he heard a lot of tussling. He stepped inside and saw one of the men run into the living room and grab a big ashtray and other objects; the man ran back toward the bedroom and threw the objects. Then, Mun heard several gunshots. Mun could not see who was shooting or who was shot. After the shots, all four men—Armstrong, Williams, Kettler, and Phillips—ran out of the house.

Meanwhile, Johnson ran to a neighbor's house. After knocking on a door, she asked the neighbor to call 911. She then heard gunfire and ran back toward Shaw's house. On her way, she saw the same men she had seen enter the house; the men ran out of Shaw's house, jumped into a brown car, and drove away. Johnson found Dyer lying on the bedroom floor, unresponsive and bleeding from multiple gunshot wounds, which were caused by two separate bullets. One bullet pierced Dyer's heart, causing his death. Dyer also had several lacerations and abrasions on his head and right hand and a bite wound. An expert opined that Phillips was the probable biter.

Five shell casings, three projectiles, and one unfired bullet were collected from the scene, and two additional projectiles were collected from Dyer's body during the autopsy. All the shell casings, the projectiles, and the unfired bullet were 9 mm. A fire and tool mark examiner identified the five fired bullets as being fired from the same weapon.

During the investigation into the shooting, Armstrong presented numerous inconsistent versions of what happened on August 10, 2007. In Armstrong's first two interviews with law enforcement officers, he denied knowing anything about Dyer's death. Nevertheless, based on other information learned during the investigation, he was arrested and charged with premeditated first-degree

murder, in violation of K.S.A. 21-3401(a), and criminal possession of a firearm, in violation of K.S.A. 21-4204(a)(4)(A).

After several months in jail, Armstrong requested a third interview, apparently in the hope of receiving a plea deal. During this interview, which occurred on December 28, 2007, Armstrong admitted to being present when the shooting occurred. He indicated that before the shooting he had been driving around with Williams and Kettler, and they had told him Williams had been robbed at gunpoint by Dyer and another man. While they were driving around, they received a phone call from Phillips telling them that Dyer was at a nearby liquor store and smoke shop. Williams immediately drove to the liquor store, where Phillips told them that Dyer was on his way to Shaw's house. Armstrong asked to be dropped off at a friend's house, but Williams drove Armstrong and the others to Shaw's house. On the way, they decided they would beat up Dyer and that they would not use guns. Despite the no-guns-allowed agreement, Phillips apparently took a gun with him and used it to shoot Dyer. Under this version, Armstrong was not an active participant in the fight. Rather, Kettler and Phillips fought with Dyer, and Armstrong remained where he could only see some of the action and hear the gunshots. After they left Shaw's house, the others argued with Phillips because they agreed not to shoot Dyer.

In April 2008, as part of a plea agreement, Armstrong gave a sworn deposition-style statement to the district attorney with Armstrong's attorney present. This statement was also admitted into evidence at Armstrong's trial. In this statement, Armstrong's story changed drastically. Not only did Armstrong admit to being at the scene of the shooting, he admitted that he, Williams, Kettler, and Phillips intended to kill Dyer.

More specifically, Armstrong again indicated that Williams was searching for Dyer because of the robbery, but in this statement he reported that he had been aware of the robbery for some time. Before the day of the shooting, Armstrong, Williams, and Kettler decided they would shoot Dyer if they saw him. At the time of these conversations, Phillips was in jail, but Kettler telephoned Phillips and informed him of the plan by using "code." Armstrong

indicated his willing participation in the plan and even said that he wanted to be the one to shoot Dyer because, just a couple of days after Williams had been robbed, Armstrong had been grazed by a bullet during a drive-by shooting. He believed Dyer was one of the shooters.

On the day Dyer was shot, Armstrong stated that he was driving around with Kettler and Williams when Kettler got a phone call from Phillips, who had just been released from jail. Phillips informed Kettler that Dyer was at the smoke shop. Williams quickly drove to the smoke shop. In route, Kettler opened a hiding place in the dashboard of Williams' car and pulled out a gun, which Kettler handed to Armstrong. As soon as Williams pulled into the alley near the smoke shop, Armstrong and Kettler jumped out of the car and ran in the direction of the smoke shop. Phillips met them and told them that Dyer was on his way to Shaw's house. The group then drove to Shaw's house. Along the way, Kettler used Phillips' phone to call Shaw, but Armstrong did not hear the conversation.

When Williams, Kettler, Phillips, and Armstrong arrived at Shaw's house, Armstrong, Kettler, and Phillips got out of the vehicle and went up to the front of the house while Williams turned the vehicle around to park on the other side of the street. Armstrong still held the gun. Williams then joined the others, and Kettler knocked on the front door. After a long pause, someone said, "Who is it?" and Kettler replied, "Little Man." Then Mun opened the door and said, "Two of y'all come through the back and two of y'all come through the front." Armstrong and Kettler stayed at the front of the house, while Williams and Phillips went around the back. Williams and Phillips soon returned because a fence prevented them from accessing the back door. Phillips then grabbed the gun from Armstrong, and the four men entered the house.

Phillips, who was the first one in the house, demanded, "Where is he at?" Johnson replied that he was not there and ran out of the house. Phillips headed to the back part of the house and into the bathroom, where he pulled back the shower curtain. Dyer jumped out and starting fighting with Phillips. Kettler, who ran past Arms-

trong to help Phillips, wrestled with Dyer for control of the gun Phillips had been carrying.

Armstrong joined in the fight by trying to pull Dyer off Phillips. When he was unsuccessful, Armstrong ran into the living room, grabbed an ashtray, returned to the fight, and started hitting Dyer on the top and back of his head. Phillips soon got loose, went to the bedroom, and cocked the gun. Dyer then jumped on Phillips' back and started fighting again. Armstrong again hit Dyer in the back of the head with the ashtray, causing Dyer to fall to the floor. At that point, Phillips stepped back and started shooting. Then Phillips walked out, and Kettler, Williams, and Armstrong followed.

After Armstrong gave this sworn statement and agreed to testify in proceedings against his codefendants, the State agreed to lower the charges against Armstrong to conspiracy to commit first-degree murder with a sentence of 12 to 15 years of imprisonment. Consistent with the plea agreement, Armstrong testified at a joint preliminary hearing relating to the charges against Williams, Kettler, and Phillips. A transcript of this preliminary hearing testimony was also admitted at Armstrong's trial and read into the record.

Armstrong's testimony at the joint preliminary hearing was largely consistent with his sworn statement. Armstrong testified that he, Williams, Kettler, and Phillips wanted to find Dyer because he had robbed Williams, and, if they found Dyer, they planned to "[b]low his head off." Armstrong again admitted that he wanted to be the one to shoot Dyer because of the drive-by shooting, and he admitted that Kettler had handed him a gun while they were on their way to the liquor store.

After this testimony and Armstrong's own preliminary hearing, Armstrong decided not to cooperate with the State. In a notarized affidavit handwritten by Armstrong, he stated that his prior statements were not true and were the result of coercion by his former defense counsel. Accordingly, the State revoked the plea deal and reinstated the charges of premeditated first-degree murder and criminal possession of a firearm.

Armstrong did not testify at the first joint trial, which ended in a mistrial after the jury advised the trial court it could not reach a

verdict. Armstrong again changed course and, at his individual re-trial, decided to testify in his own defense. During his trial testi-mony, he indicated that his previous statements were not true. He explained that he had accused Phillips, Kettler, and Williams be-cause he wanted to seek revenge against them after he had been led to believe they had betrayed him and were claiming he was the shooter. He testified he read all the paperwork and law enforce-ment reports and made up a story that matched what was discov-ered during the homicide investigation. After explaining the pre-vious statements, Armstrong proceeded to testify to "what really happened."

Armstrong told the jury that on the day of Dyer's shooting, Armstrong was at his girlfriend's house when Williams and Kettler picked him up to go driving around in Williams' vehicle. They then went to Kettler's "baby mama's house." While there, Kettler re-ceived two calls on Williams' phone. One call was from an individ-ual named Vanessa, who wanted to purchase crack cocaine. The other call was from Shaw, who told Kettler she had some money she owed him. Kettler, Williams, and Armstrong first went to Va-nessa's, which was "right around the corner from the smoke shop." While there, Phillips called and asked to be picked up at the smoke shop. Kettler and Armstrong walked to the smoke shop and met up with Phillips, who told them they needed to hurry up because he needed to make a run. Armstrong, Phillips, and Kettler ran back to Vanessa's, where Williams was waiting. On the drive to Shaw's, Kettler asked Phillips if he could use Phillips' phone. Armstrong guessed it was so Kettler could call Shaw.

As Armstrong's testimony continued, he indicated the four men entered Shaw's house and Shaw started counting out the money she owed Kettler. When she finished, Johnson said, "[L]et me talk to you all." Johnson acted like she was going to the back of the house, but she let Phillips and Kettler go in front of her. Then, out of nowhere, there was the sound of a curtain being snapped back, and Dyer came out of the bathroom with a black gun in one hand and a silver gun in the other. He said, "[Y]ou-all drop out," mean-ing give him your property. "A split second later [Phillips], all in one motion, . . . he had [Dyer's] one arm which made it go into

the wall, hit the wall so hard that one gun flew out of [Dyer's] hand and hit the wall so hard that the clip fell out of it."

Kettler and Phillips lunged after the other gun, which was still in Dyer's hand, and they started to wrestle with Dyer. Armstrong tried to grab Dyer around his neck and pull him to the floor, but there was not enough room. Armstrong saw the gun and grabbed it, but all he was able to do was pull back on the top of the gun. Armstrong then went into the living room to find something to use to hit Dyer. He grabbed an ashtray and used it to hit Dyer in the face. The ashtray flew out of Armstrong's hand, so Armstrong turned and grabbed a mug and started hitting Dyer again.

At some point, Phillips got loose and ran to the bedroom. Dyer followed and grabbed Phillips by the neck. In turn, Armstrong grabbed Dyer by the back of his shirt and hit him in the back of the head three times, causing Dyer to fall to the floor. Then, Phillips "turned around and started shooting." Kettler came out of nowhere and shoved Phillips into the wall and said, "Let's go."

As they were leaving the house, Armstrong saw Williams pick up the first gun that Dyer had dropped. They got back into the car and headed to the home of Armstrong's girlfriend. At the house, Armstrong, Kettler, and Williams argued with Phillips because he was not supposed to shoot Dyer.

The jury convicted Armstrong of premeditated first-degree murder, in violation of K.S.A. 21-3401(a), and criminal possession of a firearm, in violation of K.S.A. 21-4204(a)(4)(A). Armstrong received a controlling sentence of life imprisonment without the possibility of parole for 25 years for the premeditated first-degree murder conviction and 11 months' imprisonment for the criminal possession of a firearm conviction.

Armstrong filed a timely appeal, over which this court has jurisdiction under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

## PROSECUTORIAL MISCONDUCT

In his first issue on appeal, Armstrong claims the prosecutor violated his right to a fair trial by committing prosecutorial misconduct. Armstrong separates his argument into four segments.

Three of the arguments relate to different portions of the prosecutor's closing and rebuttal arguments. As to those arguments, we hold that two of the prosecutor's statements were outside the wide latitude allowed but did not deprive Armstrong of a fair trial. Armstrong's fourth prosecutorial misconduct argument relates to an alleged violation of an order in limine. With regard to this claim of error, we conclude the record is not sufficient for us to determine whether there was misconduct.

*General Principles and Standard of Review*

Generally, a prosecutor has wide latitude in crafting arguments. Nevertheless, the arguments "must accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.' " *State v. Raskie*, 293 Kan. 906, 917, 296 P.3d 1268 (2012) (quoting *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 [2004]).

Appellate review of allegations of prosecutorial misconduct, including misconduct occurring during closing arguments, which need not be preserved by a contemporaneous objection, requires a two-step process. First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013); *Tosh*, 278 Kan. at 85.

In analyzing the second step of whether the defendant was denied a fair trial, an appellate court considers three factors: "(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." No one factor is controlling. *Bridges*, 297 Kan. at 1012; *Tosh*, 278 Kan. at 93.

Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Bridges*, 297 Kan. at 1012 (citing *Tosh*, 278 Kan. at 97). In *Chapman*, the United States Supreme Court directed that a constitutional error can be deemed harmless only if "the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If the error does not violate the United States Constitution, the harmless error analysis is defined in K.S.A. 60-261, and the test is whether "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Even though we have applied this dual harmless error standard, we also have observed that, as a practical matter, the result of the harmless error evaluation depends on the outcome of the constitutional standard. "[B]oth the constitutional and nonconstitutional error clearly arise from the very same acts and omissions," and the constitutional standard is more rigorous. Thus, the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard. See *Bridges*, 297 Kan. at 1015 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]).

Turning to this case, we apply these standards to the three challenged passages from the prosecutor's closing and rebuttal arguments. Armstrong challenges: (1) A portion of the State's closing argument in which the prosecutor told the jurors that they had already formed opinions; (2) another portion of the State's closing argument in which the prosecutor told the jurors that Armstrong would be a "free man" and would be "out of here" if they believed his trial testimony; and (3) a portion of the State's rebuttal argument in which the prosecutor implied that Armstrong would lie about being at the scene of the crime if there was no evidence to contradict it.

### 1. *Statement telling the jurors they already have an opinion on Armstrong's guilt*

Turning to the first contention, during the State's closing argument the prosecutor emphasized the trial court's instruction that it was for the jurors to determine the weight and credit to be given to the testimony of each witness. The prosecutor continued by stating:

"You have a right to use common knowledge and experience in regard to the matter about that which a witness has testified. Again, that's your common sense instruction. That's the one where we tell you that just because you are selected as jurors doesn't mean we're asking you to suspend your common sense, forget your life experiences. You were chosen for a reason. Because all of you have different life experiences that you bring to the table. We want you to use those. I know all of you have common sense. I asked you-all and you said you had it, you-all said you'd use it. I'm confident if you do that, if you use your life experience, use your common sense and listen to the evidence and just decide yourself what makes sense to me, what do I believe based on what I've heard, because you knew nothing about the case before you walked in. *But as you sit right there, you have an opinion, you don't get to share it yet until you deliberate, but you have an opinion. Every one of you has an opinion right now.*

"That opinion is based on what, the evidence that you heard and you filter through your life experience and common sense. I told you the defendant was charged with two crimes, the first one is first degree premeditated murder and that's in Instruction No. 7. The State is required to prove to you those three elements." (Emphasis added to challenged statements.)

According to Armstrong, telling the jurors that they each had an opinion about the case violated K.S.A. 22-3420(2), which requires the trial court to admonish the jury at every break "that it is their duty not to converse with, or allow themselves to be addressed by any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them." In this trial, the court admonished the jury in accordance with this statute at the beginning of the trial and every time the jury separated. Yet, despite the repeated direction that jurors should not form an opinion until the case was finally submitted, the prosecutor, according to Armstrong, essentially told the jury it did not have to follow those directions. The State counters by arguing that the prosecutor's statement was "merely an acknowledgement that the jurors had been properly assimilating and eval-

uating the evidence as it was presented within the realm of their own life experience and common sense," which is simply an accurate statement of human psychology.

The State's argument, however, ignores the plain language of both the trial court's admonition to the jury and K.S.A. 22-3420(2), which broadly indicates the jurors are not to form or express an opinion "on any subject of the trial" until the case is finally submitted to the jury. Thus, the prosecutor's statements are contrary to established Kansas law and are outside the wide latitude allowed a prosecutor in closing argument. See *Raskie,* 293 Kan. at 917 (prosecutor commits misconduct if he or she misstates the law).

Having found that the prosecutor committed misconduct, we turn to the second step of our analysis, which consists of applying the three factors used to determine whether the prosecutor's misstatements denied Armstrong a fair trial. First, we must determine if the misconduct was gross and flagrant. See *Bridges*, 297 Kan. at 1012. Often in examining this factor, we assess whether the statement is contrary to a longstanding rule of law. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors determining gross and flagrant conduct include repeated comments, emphasis on improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right); see also, *Bridges*, 297 Kan. at 1015-16 (prosecutor's conduct was gross and flagrant because it violated the well-established rule prohibiting comments on the defendant's credibility). Here, the prosecutor's statement was contrary to a statute enacted in 1970, the contents of which are reiterated many times during every jury trial. See L. 1970, ch. 129, sec. 22-3420. Consequently, we conclude the statement was gross and flagrant.

Under the second factor, it must be determined whether the prosecutor's statement was a result of ill will. A prosecutor's ill will is often " 'reflected through deliberate and repeated misconduct.' " *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011). Here, when considered in context, the misstatement appears to be nothing more than an ill-phrased attempt to implore the jurors to use their common sense and experience when weighing the evidence and to remind the jurors of the voir dire discussions about the

importance of doing so. Further, the statement was isolated; the prosecutor did not return to the point. Given this context, we conclude the prosecutor was not motivated by ill will.

Finally, we consider whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. In arguing that the misstatement was likely to have affected the jurors' deliberations, Armstrong quotes from *State v. McLeskey*, 138 Idaho 691, 694, 69 P.3d 111 (2003), in which the Idaho Supreme Court expressed its concern that "[h]aving come to a tentative opinion regarding an issue, jurors may then require the defendant to disprove that opinion, thereby shifting the burden of proof to the defendant." As we consider this argument, it is important to place the *McLeskey* court's discussion in its full context and consider that context in light of guidance from decisions of this court.

In *McLeskey*, the trial court told the jurors they could discuss the case among themselves during the trial, as long as all discussions occurred in the jury room with the alternates present and, " 'most important, you reach no final decisions on any contested questions, remembering that you're only making temporary assessments as the case progresses.' " 138 Idaho at 693. The Idaho Supreme Court noted that "[t]here are several risks inherent in permitting jurors in a criminal case to discuss the case among themselves before it is submitted to them to reach a verdict." 138 Idaho at 694. One such concern is that "[j]urors who have announced their opinions regarding such 'temporary assessments' may be less likely to change their minds in the face of evidence or argument that is contrary to their expressed opinions" and, in this context, might shift the burden. 138 Idaho at 694. The Idaho court's principal concern was with allowing jurors to express and discuss their views before the case had been submitted, which is not what the prosecutor in this case was suggesting Armstrong's jury should do.

The concern with jurors announcing and discussing preliminary leanings was also discussed by this court in a case cited by the State, *State v. Hays*, 256 Kan. 48, 883 P.2d 1093 (1994). In *Hays*, after a midmorning recess during the State's presentation of evidence, the court reporter provided the trial court with some questions the

jury wanted to have asked of a witness. When court reconvened, the judge relayed the jurors' questions and asked the State to recall a witness to answer the questions. On appeal, the defendant argued the procedure was contrary to K.S.A. 22-3420(2), in part because it condoned the jurors' obvious discussion of the evidence during the midmorning recess.

The *Hays* court, in discussing the risks of allowing the jurors to ask questions, agreed that one of the more troubling aspects of the procedure was "[t]he fact that the jurors discussed among themselves what questions to ask." 256 Kan. at 60. The court continued: "While jurors clearly cannot refrain from assimilating and evaluating the evidence as it accumulates during trial, the jurors should not begin deliberating on the case until it is submitted to them." 256 Kan. at 60.

Considering the distinction drawn by the *Hays* court between deliberations and the process of assimilating and evaluating evidence, the prosecutor's statements here appear to be targeted more toward the idea of jurors evaluating evidence than urging the jurors to do or say anything that might make them less open to full consideration of both sides of the case. Further, without question, we want jurors who are thoughtfully listening and testing one witness' testimony against the testimony of other witnesses and any physical evidence. Doing so is not contrary to K.S.A. 22-3420(2) or the jury admonition.

The *Hays* decision explains this by stating: " 'We properly expect jurors to refrain from deliberating on a case until it is submitted to them. [Citation omitted.] Deliberation in this sense, however, means articulating and exchanging views, albeit preliminary, with one's fellow jurors. [Citation omitted.] It does not mean the absence of thought, however preliminary.' " 256 Kan. at 60 (quoting *Spitzer v. Haims & Co.*, 217 Conn. 532, 545, 587 A.2d 105 [1991]); see, *e.g.*, *State v. Griffin*, 262 Kan. 698, 702-03, 941 P.2d 941 (1997) (holding that jurors did not prematurely begin deliberations even though a juror was heard stating to other jurors that " 'the witness and participants were all old enough to remove themselves from the situation' " and other witnesses nodded their heads affirmatively); *cf. United States v. Steele*, 298 F.3d 906, 911 (9th Cir.

2002) (noting that jurors who reached a verdict on Monday morning may have come "to a resolution during a weekend when they individually pondered evidence," which was not contrary to the deliberation process because it is unrealistic to expect the jurors not to think about the case during the trial).

In this case, the prosecutor's poor choice of words conflicted with K.S.A. 22-3420(2) and the trial court's directions to the jurors. Nevertheless, the prosecutor, when his comments are read in context, seemed to be asking the jurors to consider their credibility assessments in light of the instructions of the court and his arguments. In fact, the prosecutor followed the misstatements with arguments about how the evidence established the elements of the charged offenses. The prosecutor obviously wanted the jurors to consider the evidence in a light favorable to the State, but the prosecutor's continuing arguments indicate the prosecutor wanted the jurors to continue the process of filtering the evidence through the sieve of common sense and experience and to not yet reach a final decision.

In addition, as we consider the effect of the statements on the jurors, we contrast the ambiguous statements of the prosecutor ·with the clear admonition of the trial court to not form or express an opinion until the case was finally submitted to them. The jurors had repeatedly heard this admonition and, given the constant repetition, it seems unlikely the jury would have stopped listening to either counsel's arguments, stopped considering the weight and credibility of evidence, or decided that the defense had the burden of proof or persuasion. Moreover, because we presume the jury followed the trial court's instructions, which told the jurors the burden of proof never shifts to the defense and told them to keep an open mind until the case had been submitted, the trial court's guidance served to mitigate any potential harm caused by the prosecutor's statements. See *State v. Huddleston,* 298 Kan. 941, 956, 318 P.3d 140 (2014) ("Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."); *State v. Hebert,* 277 Kan. 61, 85, 82 P.3d 470 (2004) (noting jury had been given proper PIK instruction and was presumed to have followed

it over prosecutor's statements); *State v. Jamison*, 269 Kan. 564, 572-73, 7 P.3d 1204 (2000) (prosecutor's misstatement on the law on premeditation was not reversible error when the jury was properly instructed on the law).

More damaging to Armstrong's cause than the prosecutor's statements is the reality that Armstrong had presented six inconsistent versions of events and had admitted to telling lies while under oath. Also, Armstrong had admitted to studying the details of police reports and crafting his previous sworn statement and testimony to fit those details. While he asked the jury to believe that he was finally telling the truth in his trial testimony, he could not stop his past practice of trying to match the details of the evidence. For example, in Armstrong's trial testimony about his struggle with Dyer for the gun, he told the jury all he could do was pull the top part of the gun and, "I didn't even know a bullet had popped out, but that explains the bullet that wasn't shot in evidence."

In contrast to Armstrong's ever-changing story and transparent attempts to match the physical evidence, the jury heard other witnesses who provided evidence of a feud between Armstrong's friends and Dyer and laid out a chronology of events that suggested Armstrong and his codefendants went to Shaw's house, with at least one gun in hand, for the purpose of finding Dyer. While the evidence against Armstrong was not overwhelming, it was sufficiently strong to convince us that the misconduct would likely have had little weight in the mind of the jurors.

### 2. *"If you believe the defendant, he's a free man" and "he's out of here"*

Armstrong's next prosecutorial misconduct argument is based on a second portion of the prosecutor's closing argument. While going through the elements of the charged crimes, the prosecutor stated:

"We have Antonio Armstrong right in the thick of it, right in the middle of it smashing James Dyer in the head with that ashtray, multiple times. There's no doubt he's an active participant. Then the question was was it done with premeditation. Again, that comes down to what do you believe? Do you believe the defendant? *If you believe the defendant he's a free man when you get done.* There's

no issue of premeditation if you believe him, because they went over there for what, so [Kettler] could collect some money that [Shaw] owed him. . . . There's no crime if you believe him. What he's told you is self-defense or defense of another *he's a free man.*

"The second charge is possession of a firearm. Again, *i.e.*, the third element on that on Instruction No. 12 is that it occurred on August 10th of '07 here in Shawnee County, again that's a nonissue; two, that the defendant within ten years preceding this possession had been convicted of a felony. Well, he stipulated to that. He's a convicted felon, and, one, that Antonio Armstrong knowingly had possessed the firearm. *Again, if you believe him, no, he's out of here.* If you believe all the other evidence, including his earlier statements under oath, not only did he possess the firearm, he wanted to do it." (Emphasis added to challenged statements.)

Armstrong argues that these statements were improper for two reasons. First, the jury could have believed the version of events in Armstrong's trial testimony and still convicted him of any of the instructed lesser included offenses, including imperfect self-defense voluntary manslaughter, heat of passion voluntary manslaughter, or voluntary manslaughter. Second, these statements improperly appealed to the jury's sense of duty to protect the community.

We first focus on Armstrong's arguments that the prosecutor was wrong in saying that the defendant was a "free man" or "out of here" if the jury believed Armstrong's trial testimony. In considering these arguments, there are two significant aspects of Armstrong's trial testimony that he now ignores.

First, Armstrong testified that Phillips was the shooter and that Armstrong only touched the gun when trying to remove it from Dyer's grip. Thus, Armstrong's culpability for Dyer's death depended on his aiding and abetting Phillips, and this requires that he had the intent to promote or assist in the commission of the crime. See K.S.A. 21-3205(1) ("A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."); *State v. Llamas*, 298 Kan. 246, 254-55, 311 P.3d 399 (2013) (discussing intent element of aiding and abetting); PIK Crim. 3d 54.05 (responsibility for crimes of another) ("A person who, either before or during its commission, intentionally (aids)

(abets) (hires) (counsels) (procures) another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.").

In some circumstances, an aider and abettor could possess that intent based, for example, on (a) his or her own unreasonable belief that it was necessary to defend someone or (b) his or her own heat of passion, but the second aspect of Armstrong's testimony removes those and similar possibilities because Armstrong testified that Phillips was not supposed to shoot Dyer. In fact, he indicated that he, Kettler, and Williams argued with Phillips after they left Shaw's house because Phillips had fired the gun. This testimony indicates that Armstrong did not form the intent to assist in the shooting of Dyer, either in an intentional or a reckless manner; rather, Armstrong did not believe the circumstances warranted shooting Dyer. Hence, as the prosecutor argued, if the jury fully believed Armstrong's trial testimony, he did not intend to aid or abet the shooting of the gun, the uncontroverted cause of death.

Thus, the prosecutor's point was correct—if the jury fully believed Armstrong, he did not aid and abet the shooting of Dyer and therefore could not be convicted of any degree of murder. Likewise, the second statement—"Again, if you believe him, no, he's out of here," which referred to the criminal possession of a firearm charge—correctly reflected the result if the jury fully believed Armstrong's testimony. Under Armstrong's trial version of events, he never possessed a firearm; at most he touched the top of a gun and, therefore, could not be convicted of possession of a firearm. Consequently, in this respect, the statement was not misconduct.

In other portions of the closing argument, the prosecutor covered the possibility that a juror would believe some, but not all, of Armstrong's trial testimony. In addition, the prosecutor told the jury it must consider the various lesser included offense instructions. Hence, when considered in context, the prosecutor's statements were not an improper statement of the outcome that would result if the jury fully believed Armstrong's trial testimony.

With regard to Armstrong's argument that these statements were an improper appeal to the jury's sense of duty to protect the community, "a prosecutor crosses the line of appropriate argument when that argument is intended to inflame the jury's passions or prejudices or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law." *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011); *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2004). Arguing the prosecutor's statements crossed the line, Armstrong suggests these statements are similar to those in *State v. Finley*, 273 Kan. 237, 244, 42 P.3d 723 (2002), in which the prosecutor remarked to the jury, "We don't want people making meth in our communities." This court held the comment was an improper appeal to the jury to render a verdict to protect the community. 273 Kan. at 244-45.

In contrast, the prosecutor in this case was not directing the jurors away from their duty to decide the case based on the evidence by suggesting the jurors needed to protect the community. Instead, the prosecutor directed the jurors to their duty to find the defendant not guilty if it found his trial testimony and, thus, his defense credible. Therefore, we conclude that the prosecutor's statement was an appropriate argument based on the evidence and was not misconduct.

### 3. *Statements implying Armstrong would lie*

The final challenged statements occurred during the State's rebuttal argument. The prosecutor stated:

"Look at the facts, look at the evidence compared to what he told you. And as you dig deep as he's requested, you'll see the inconsistencies with his versions. Keep in mind, his most recent version which is, I believe, the third, fourth or fifth one still isn't consistent. *Now he knows there's certain things he can't deny. I mean, the evidence is overwhelming he can't deny being there. If he could, he would. We know Antonio Armstrong is all about self-preservation, we know he will do anything and everything he can to benefit himself, including denial, half-truths, truths, other stories. Whatever it takes he will do and he will say, but look at his final version because he knows what the evidence is so he has to admit certain things,* but it's a lot like Dr. Winter's testimony, if you remember when he does his analysis, he takes the impression and compares it to the bite and lineup known or congruent points and then as he works right to left he sees where

it starts falling apart. As you dig deeper, things don't make sense, given what he said the intended purpose was for going over." (Emphasis added to statements.)

Armstrong argues that these statements constituted misconduct for three reasons: (1) The prosecutor violated a clear and longstanding rule that a prosecutor is to refrain from injecting his or her personal opinion on a defendant's truthfulness; (2) the prosecutor speculated on matters outside the record; and (3) the prosecutor was acting as a witness.

As Armstrong argues, it is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, including the defendant. See *State v. Elnicki*, 279 Kan. 47, 60-64, 105 P.3d 1222 (2005); *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 (2003); *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000). Nevertheless, a prosecutor has " 'freedom . . . to craft an argument that includes reasonable inferences based on the evidence' " and " 'when a case turns on which version of two conflicting stories is true, [to argue] certain testimony is not believable.' " *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009) (quoting *Davis*, 275 Kan. at 121); *Pabst*, 268 Kan. at 507. For example, it is not improper for a prosecutor to offer "comments during closing arguments regarding the witness' motivations to be untruthful." *King*, 288 Kan. at 353; see *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009) (A prosecutor may offer "the jury an explanation of 'what it should look for in assessing witness credibility.' "); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) (same). But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. See *State v. Akins*, 298 Kan. 592, 606-08, 315 P.3d 868 (2014); *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012); *King*, 288 Kan. at 353; *Elnicki*, 279 Kan. at 60-62; *Davis*, 275 Kan. at 121; *Pabst*, 268 Kan. at 506-07.

For example, in *Pabst*, 268 Kan. at 505-10, this court concluded that the prosecutor committed misconduct by calling the defendant or defense counsel liars at least 11 times during closing argument. The prosecutor's arguments were his personal opinion on

the credibility of the defendant and the State's witnesses, which was unsworn testimony and was clearly improper, especially when Pabst's credibility was crucial to the case. 268 Kan. at 507. In contrast, in *Finley*, this court found that the prosecutor's statement, "He's said various things at various times, and the reason why people do that is because they can't keep all the lies straight," was a proper comment because evidence had been admitted establishing that the defendant had made inconsistent statements. 273 Kan. at 246. Yet, as in *Pabst*, when the prosecutor in *Finley* strayed from the evidence and stated, "And I'm sorry, but I just can't buy this story," the court held the prosecutor expressed her belief as to credibility and committed misconduct. *Finley*, 273 Kan. at 247; *Pabst*, 268 Kan. at 507.

Similarly, in *Elnicki*, 279 Kan. 58, this court acknowledged that several of the prosecutor's statements, such as, " 'The defendant's story of what happened lacks plausibility and credibility,' " were arguably a fair comment on the evidence of Elnicki's first three versions of the events because each version was succeeded by yet another inconsistent version. 279 Kan at 63. However, the court concluded that the prosecutor's comments about Elnicki's final versions—a "fabrication," "yarn," "final yarn," and "the yarn spun here, the four-part yarn"—were not based upon a later inconsistent statement and were unquestionably outside the wide latitude allowed in discussing the evidence. 279 Kan. at 62-64.

Here, there was evidence that Armstrong gave five pretrial statements of events, including a sworn statement to the district attorney and sworn court testimony at the joint preliminary hearing of Williams, Kettler, and Phillips. These five statements were largely or partially inconsistent with each other and were all dramatically different from the sixth version, his trial testimony. The six versions ranged from complete denial of any knowledge regarding the shooting to admitting to willing participation in the premeditated murder of Dyer. Further, Armstrong admitted at trial to giving "a bullshit story" in his previous statements, which he admitted were crafted to match law enforcement reports. He also admitted to giving a slightly different story in his sworn statement—"I gave them somewhat, a little bit of the truth but not all the truth." And

he admitted to lying under oath at the joint preliminary hearing of Williams, Kettler, and Phillips. Thus, the prosecutor's statement—"denial, half-truths, truths, other stories"—was a fair comment on the evidence because of all the inconsistent statements and the defendant's acknowledgement at trial that his previous statements were not true.

Likewise, the prosecutor's statement—"Now he knows there's certain things he can't deny"—was a fair comment on the evidence. During cross-examination, the prosecutor asked Armstrong: "There were certain things you couldn't deny so you had to somehow weave those into your story; is that right?" Armstrong replied, "Right, right." See *State v. Bridges*, 297 Kan. 989, 1014, 306 P.3d 244 (2013) (prosecutor's statement that the information provided by the defendant was false was fair comment on the evidence because defendant openly admitted that he had made false statements).

Similarly, the prosecutor's comment—"Armstrong is all about self-preservation"—was another fair comment on the evidence. Throughout his entire trial testimony, Armstrong discussed how he made up the versions to get a plea deal and that he believed he would not get a plea deal if his story did not match details in the police reports. He further testified at trial that he made himself look like he was "disinvolved with the crime" so the charges would be dropped or so he would get a good plea deal.

Nevertheless, the final challenged statement—"the evidence is overwhelming he can't deny being there. If he could, he would"—went too far and was outside the wide latitude afforded a prosecutor. The statement was nothing more than the prosecutor's personal opinion regarding Armstrong's credibility and speculation regarding what Armstrong might have done if there had been less evidence about his presence at the scene. Although Armstrong had conceded he matched his pretrial statements and testimony to reports and other evidence, he claimed to be telling the truth at this trial. Thus, this speculative comment was not tied to evidence.

Having found misconduct, we must consider the second step of the analysis and Armstrong's claim that the statement denied him a fair trial. In discussing the first factor in the analysis of whether

the misstatement was gross and flagrant, Armstrong contends that the caselaw in this area is well settled and a prosecutor, especially an experienced one such as the one in this case, should know how to walk the line drawn in our caselaw. We agree that prosecutors should be very aware of Kansas caselaw when arguing about credibility and should be extremely careful to not state a personal opinion. Because we have made this warning in many, many cases, we conclude the prosecutor's failure to heed the warning was gross and flagrant. See *Bridges*, 297 Kan. at 1015-16; *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010).

Regarding the second factor of ill will, we see no evidence of ill will. The prosecutor had been basing his comments on the evidence and only strayed one time. The point was not repeated or emphasized.

Finally, we conclude the comment was likely to have little weight in the minds of jurors, given the evidence against Armstrong. As we have discussed, Armstrong faced an uphill battle in convincing the jury his trial testimony should be believed over the previous five versions, especially since he admitted to lying under oath. Further, his admission that there were certain things that he could not deny because of the evidence was very similar to the comment made by the prosecutor. Consequently, we conclude the prosecutor's comment that Armstrong would deny being at the scene of the crime if the evidence allowed had little weight in the minds of the jury.

### 4. *Witness violation of order in limine*

In his final prosecutorial misconduct argument, Armstrong notes that two State's witnesses violated a trial court order in limine prohibiting the parties or any witnesses from referring to Dyer as a "victim." Armstrong does not complain that the trial court should have granted a mistrial because of these references—probably because Armstrong did not request one—but he claims that the "prosecutor's failure to ensure that his witnesses would not refer to Dyer as a victim, amounts to misconduct."

Armstrong's argument fails because there is no evidence in the record on appeal regarding whether the prosecutor did or did not

inform the witnesses of the order in limine, an essential point in determining whether the order was violated because of prosecutorial misconduct—that is, the failure of the prosecutor to fulfill the duty of instructing the witnesses about the existence and content of the order in limine—or because a witness negligently or intentionally violated the order after being fully cautioned by the prosecutor. See *State v. Santos-Vega*, 299 Kan. 11, 25-26, 321 P.3d 1 (2014). The burden to ensure that there is such a record rests with the defendant, a point this court made clear in *State v. Crume*, 271 Kan. 87, 102, 22 P.3d 1057 (2001), by stating: "Outside the presence of the jury, the defendant's attorney should inquire if the prosecutor warned or failed to warn the witness to refrain from making such a statement. The prosecutor must then articulate the reason for the violation."

The inquiries specified in *Crume* were not made here. Instead, when the defense objected during one witness' testimony and asked for a bench conference, the defense counsel stated: "I'm assuming the State has admonished witnesses not to use the term 'victim.'" Because defense counsel made an assumption rather than make the necessary inquiry, this court has no basis on which to make the evaluation of whether there was prosecutorial misconduct. Consequently, Armstrong's argument was not properly preserved and fails as a result.

## FAILURE TO INSTRUCT ON UNINTENTIONAL BUT RECKLESS SECOND-DEGREE MURDER

Armstrong's second argument on appeal is that the evidence supported a lesser included offense of unintentional but reckless second-degree murder and the trial court's failure to instruct on that lesser included offense was clearly erroneous. The trial court instructed the jury on premeditated first-degree murder, intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter. Armstrong did not request an instruction on reckless second-degree murder.

*Standard of Review*

In *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012), this court discussed the analytical framework to be applied when a

claimed error relating to a jury instruction is raised for the first time on appeal. The initial considerations, as with all appellate issues, are whether the appellate court has jurisdiction and whether the issue has been preserved. The requirements for preservation are stated in K.S.A. 22-3414(3), which sets forth the requirement that the complaining party must have objected prior to jury deliberations in order to preserve appellate review of a claimed instruction error, but it includes an exception to the preservation requirement where the instruction or failure to give the instruction was "clearly erroneous." 295 Kan. at 511. *Williams* sets out two steps for determining if there was clear error.

First, the reviewing court determines whether the failure to give the lesser included instruction was erroneous. To make this determination, the reviewing court "must necessarily look at whether it was legally and factually appropriate for the district court to give a lesser included offense instruction." 295 Kan. at 521 (citing *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

When an appellate court considers the legal appropriateness of an instruction, "appellate review is unlimited, as with all questions of law." 295 Kan. at 161. More specifically, in the context of lesser included offense instructions, an appellate court asks whether the lesser crime is "legally an included offense of the charged crime." 295 Kan. at 161.

When an appellate court considers the factual appropriateness of a lesser included offense instruction, the determination is guided by the standard in K.S.A. 22-3414(3). As this court explained in *Williams*:

"[T]he giving of lesser included crime instructions is not a matter of discretion with the trial judge. K.S.A. 22-3414(3) directs that 'where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . , the judge *shall* instruct the jury as to the crime charged and any such lesser included crime.'" (Emphasis added.) 295 Kan. at 521-22.

In *Plummer*, this court further explained this analytical step when the claimed error involves a lesser included offense instruction and also stated the standard of review to be applied on appeal:

"[A] district court does not err in refusing to give a lesser included offense instruction on a crime which is unsupported by the evidence in that particular case.

Such an inquiry is closely akin to the sufficiency of the evidence review frequently preformed by appellate courts in criminal cases where ' "the standard of review is whether, after review of all the evidence viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." ' *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011) (quoting *State v. Drayton*, 285 Kan. 689, 710, 175 P.3d 861 [2008])." 295 Kan. at 161-62.

If after applying these standards, it is determined that the instruction was legally and factually appropriate and, therefore, should have been given, the reviewing court must conduct the second step of the analysis. Under this step, the court reviews the entire record to make a de novo determination of whether it is firmly convinced that the jury would have reached a different verdict had the instructional error not occurred. *Williams*, 295 Kan. at 515-16; see *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (noting that past cases had frequently stated the test as whether " 'the reviewing court is firmly convinced that there is *a real possibility* the jury would have returned a different verdict if the instruction had been given' " and determining that in the future the " 'real possibility' " language should be omitted to avoid any confusion with the constitutional harmless error test set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]). The second step requires a review of the entire record and a de novo determination. *Williams*, 295 Kan. at 515-16.

*Failure to Give Instruction Was Not Clearly Erroneous*

Thus, in considering whether it was error to not give a lesser included offense instruction for unintentional but reckless second-degree murder, the first inquiry is whether unintentional but reckless second-degree murder is legally an included offense of the charged crime of premeditated first-degree murder. This question is easily answered. K.S.A. 21-3107(2)(a) states: "A lesser included crime is . . . [a] lesser degree of the same crime." Second-degree murder is a lesser degree of first-degree murder and, therefore, a lesser included crime. See *State v. Rodriguez*, 295 Kan. 1146, 1153, 289 P.3d 85 (2012); *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005).

Next, we must determine if the instruction was factually appropriate, which requires consideration of how the evidence relates to the elements of the crime of unintentional second-degree murder. Those elements are defined in K.S.A. 21-3402, which states, in relevant part: "Murder in the second degree is the killing of a human being committed: (a) Intentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." The unambiguous language "requires the killing—the result—to be either intentional or unintentional." *State v. Deal*, 293 Kan. 872, 883, 269 P.3d 1282 (2012). At the time of Armstrong's trial and the filing of briefs on appeal, Kansas caselaw was inconsistent with some cases holding the focus of the inquiry is on the intentional or unintentional nature of the act that caused the death and other cases holding the focus is on the existence of intent to cause death. See 293 Kan. at 882-85. In *Deal*, we concluded the focus must be on whether the defendant intended to cause the death. 293 Kan. at 883. That, therefore, is the focus of our analysis, although we observe that Armstrong's arguments fail to establish clear error under either inquiry.

In arguing there was sufficient evidence to support the giving of the instruction, Armstrong suggests we need not look beyond the fact that the trial court instructed on reckless involuntary manslaughter. He suggests that if the trial court was convinced there was evidence of recklessness, there was evidence to support an instruction of unintentional but reckless second-degree murder. This argument fails to acknowledge that there are different degrees of recklessness involved in second-degree murder and involuntary manslaughter. See *State v. Robinson*, 261 Kan. 865, 877-78, 934 P.2d 38 (1997) (distinguishing types of recklessness necessary for second-degree murder and involuntary manslaughter). Thus, the mere fact that the trial court gave one instruction involving reckless intent does not satisfy the factual inquiry of whether a different instruction was supported by the evidence. Plus, it could be that if the question of whether there was factual support for the instruction of reckless involuntary manslaughter was before us, we would conclude it was error to give the instruction. In other words, we cannot shortcut the analysis but must make an independent deter-

mination of whether an unintentional but reckless second-degree instruction was factually appropriate.

In arguing the facts, Armstrong suggests there is "plethora of evidence to support a conviction of depraved heart murder." Specifically, he points to Armstrong's trial testimony that he went to Shaw's house with his friends for the purpose of collecting money from her and without any intention of shooting Dyer. Further, he suggests the evidence that Armstrong hit Dyer over the head with an ashtray and Phillips shot Dyer to keep Dyer from shooting them shows that Armstrong and his codefendants exhibited extreme indifference to the value of human life. As Armstrong suggests, at least in theory, the jury could have chosen to convict him of unintentional but reckless second-degree murder without having the verdict subject to reversal for insufficient evidence. This means the instruction was factually supported.

Because the unintentional second-degree murder instruction was factually and legally supported, it was error for the district judge not to give it. See K.S.A. 22-3414(3) (judge shall give instruction on lesser included crime when some evidence would reasonably justify conviction).

Nevertheless, our determination that the omission of this instruction was erroneous does not answer the question of whether the failure to give the unrequested instruction was clearly erroneous. Armstrong bears the burden of firmly convincing us that the jury would have convicted him of unintentional but reckless second-degree murder rather than premeditated first-degree murder had the error not occurred. *Williams*, 295 Kan. at 516 (citing *Ward*, 292 Kan. 541, Syl. ¶ 8). He does not succeed in carrying that burden.

First, we note that Armstrong's arguments blur any distinctions between, on the one hand, his role in aiding and abetting Phillips and the necessary intent he must have possessed and, on the other hand, the role and intent of Phillips as the shooter. As we have noted, to be liable as an aider and abettor, Armstrong must have had the intent to aid or abet Phillips in committing the conduct constituting the crime. See K.S.A. 21-3205(1). If he acted with such intent, he could "also [be] liable for any other crime committed in

pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended." K.S.A. 21-3205(2).

Applying these concepts to the facts, Armstrong's wide ranging versions of events, left many options available to the jury. It could have believed Armstrong had nothing to do with the shooting of Dyer, an account that would have been contrary to the testimony of other witnesses and even the majority of Armstrong's own statements. Alternatively, according to two versions of Armstrong's accounts—his sworn statement and his testimony at the joint preliminary hearing for Williams, Kettler, and Phillips—Armstrong willingly participated in the events surrounding the shooting and did so with the intent of "blow[ing] [Dyer's] head off." According to another version—the one found in Armstrong's December 28, 2007, statement, which is one of the two versions on which he asks us to focus—he was merely a bystander. He said nothing in this version that would suggest he aided or abetted the criminal action in any way; he was merely along for the ride. Under any of these versions, there was no suggestion that Armstrong intended to aid or abet an unintentional but reckless second-degree murder.

The other version Armstrong emphasizes is his trial testimony. In this testimony, he indicated he came to Phillips' aid and hit Dyer with the ashtray and other objects and tried to pull Dyer off of Phillips. Although this testimony was evidence that Armstrong aided Phillips' actions, Armstrong still asserted the shooting was unjustified. In fact, in a manner consistent with his December 28, 2007, statement, he indicated he, Kettler, and Williams argued with Phillips after they left Shaw's house because Phillips "was not supposed to shoot him." Thus, there was no direct evidence that Armstrong intended to aid or abet the shooting or even that Armstrong believed Phillips' actions were justified.

Nevertheless, it was foreseeable that shots would be fired during the fight as Phillips, Armstrong, and Kettler attempted to wrest the gun away from Dyer. But, according to Armstrong, the fighting had ended with Dyer lying on the floor; Dyer no longer possessed a gun. Phillips then, according to various statements by Armstrong, either "stepped back" and started shooting or "turned around and

started shooting." An expert testified that stippling indicated the handgun was only between 18 and 36 inches away from Dyer when the shots were fired. This physical evidence regarding the close range of the shooting and the number of shots fired combined with Armstrong's testimony that Dyer was down and that Phillips stepped back or turned around before firing demonstrates an intent to kill.

In addition, there was considerable evidence of preexisting animosity between Dyer and Armstrong, Phillips, Kettler, and Williams. This evidence would suggest that even if Dyer was the initial aggressor, Phillips, Armstrong, Kettler, and Williams would have used the opportunity to kill Dyer. See *State v. Barnes*, 293 Kan. 240, 264, 262 P.3d 297 (2011) (" '[I]ntent may be inferred from " 'acts, circumstances, and inferences reasonably deducible therefrom.' " ' ").

When we consider the record as a whole, we are not firmly convinced the jury would have reached a different verdict had the trial court instructed the jury on the lesser included offense of unintentional but reckless second-degree murder instruction.

### Voluntary Manslaughter Instruction

Next, Armstrong argues the trial court gave an improper voluntary manslaughter instruction. The instruction given at trial, Instruction No. 9, stated:

"In determining whether the defendant, Antonio Armstrong, is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done upon a sudden quarrel, in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

"If you decide Antonio Armstrong intentionally killed James Earl Dyer, Jr., but that it was done *upon a sudden quarrel, in the heat of passion, or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person*, the defendant may be convicted of voluntary manslaughter only." (Emphasis added to focus of challenge.)

This instruction was consistent with PIK Crim. 3d 56.05, alternative B, which applies when voluntary manslaughter is instructed upon as a lesser included offense rather than a charged crime. See PIK Crim. 3d 56.05, Notes on Use ("If the information charges

voluntary manslaughter, use alternative A. When voluntary manslaughter is submitted to the jury as a lesser offense of the crime charged under K.S.A. 21-3107[2][a], use alternative B.").

Armstrong argues the instruction is erroneous in two ways. First, he alleges that the voluntary manslaughter instruction given at trial consolidated what he refers to as "alternative means of committing the offense" and "glosses over the separate lesser included offenses of an intentional killing but upon a sudden quarrel, heat of passion, or imperfect self-defense." He argues the court should have given a separate instruction for each "alternative means." He also argues that the court erred in defining "heat of passion" and not defining "sudden quarrel" or "unreasonable but honest belief."

Because Armstrong did not object to Instruction No. 9 under K.S.A. 22-3414(3), we must apply the clearly erroneous standard of review set forth in *Williams*, 295 Kan. at 515-16, which we previously discussed. One aspect of the analysis—whether the instruction was factually appropriate—is not disputed by the parties; they agree the substance of the instruction should have been given. Their arguments focus more on the form of the instruction and the legal appropriateness of breaking the instruction into three separate instructions.

As we have noted, the instruction was consistent with the pattern instruction, which uses the language about which Armstrong complains in both alternatives A and B. This court has repeatedly approved PIK Crim. 3d 56.05, although it has not addressed the specific contention raised by Armstrong. See, *e.g.*, *State v. Miller*, 293 Kan. 46, Syl. ¶ 3, 259 P.3d 701 (2011); *State v. Bell*, 280 Kan. 358, 365-66, 121 P.3d 972 (2005); *State v. Graham*, 275 Kan. 831, 836-40, 69 P.3d 563 (2003). This court, however, has commented on Armstrong's suggestion that the trial court should modify a pattern instruction. On numerous occasions, this court has strongly urged trial courts to instruct the jury by using Kansas' pattern instructions as written, modifying them only "[i]f the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK." *State v. Appleby*, 289 Kan. 1017, Syl. ¶ 20, 221 P.3d 525 (2009); see *State v. Stevenson*, 297 Kan. 49, 57, 298 P.3d 303 (2013). Here, Arms-

trong does not suggest any facts that would differentiate this case from past decisions where we have approved the pattern instruction.

There are several additional reasons for rejecting Armstrong's arguments, which essentially call into question whether the voluntary manslaughter statute states alternative means for committing the crime. This court has not considered whether the statute defines alternative means of committing voluntary manslaughter, but this case is not the appropriate vehicle to take up that issue because Armstrong was not convicted of voluntary manslaughter and he does not challenge the sufficiency of the evidence of his conviction. See *State v. Brown*, 295 Kan. 181, 188, 284 P.3d 977 (2012) (discussing sufficiency requirement in context of alternative means). Nevertheless, even assuming alternative means were stated in one instruction, this court has held that "[t]here was no error in including both alternatives in one instruction to the jury" if there was sufficient evidence to convict the defendant of either alternative mean of committing the crime. *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994), *overruled on other grounds by State v. Brooks*, 298 Kan. 672, 317 P.3d 54 (2014).

Also, this court has repeatedly stated that the key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. *State v. Foster*, 290 Kan. 696, 711, 233 P.3d 265 (2010); *State v. Vasquez*, 287 Kan. 40, 54, 194 P.3d 563 (2008). The instruction conveyed these essential points to the jury.

Hence, we do not believe it was legally necessary to break the instruction into three separate instructions. In fact, it is difficult to imagine how that could have been done because this court, along with the courts of most states, "considers sudden quarrel to be one form of heat of passion." *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). Also, this court has held the instruction for "heat of passion" found in PIK Crim. 3d 56.04 (homicide definitions), which was the definition used in this case, is "sufficiently broad to include sudden quarrel as one form of heat of passion." 290 Kan. at 1048. Further, the structure of the instruction does not gloss over the three options. Each is clearly stated, and we

presume a jury will consider all aspects of a given instruction. See *State v. Llamas*, 298 Kan. 246, 261, 311 P.3d 399 (2013) (stating presumption that jury follows instructions). We, therefore, hold it was not error to give PIK Crim. 3d 56.05(B) as written.

We next turn to Armstrong's second argument regarding whether the trial court erred in providing a definition of "heat of passion" and not providing a definition for "sudden quarrel" or "unreasonable but honest belief." This court has held that a trial court "need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined." *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979). We further stated that "[a] term which is widely used and which is readily comprehensible need not have a defining instruction." 226 Kan. at 95.

As we have indicated, under our caselaw the concept of sudden quarrel is incorporated into the definition of heat of passion; thus, a separate definition is not necessary. The other option—"upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person"—uses widely understood words that do not require definition.

Consequently, the trial court's lesser included offense instruction on voluntary manslaughter was not erroneous.

## JUROR MISCONDUCT

Next, Armstrong argues the trial court erred in denying his motion for mistrial after a juror was allegedly caught sleeping during testimony and two other jurors were allegedly caught discussing Armstrong's guilt during a break. He argues that no reasonable person would agree with the trial court's decision to deny Armstrong's motion for a mistrial based on these instances of juror misconduct.

Both of these instances of misconduct occurred during the testimony of a fire and tool mark examiner employed by the Kansas Bureau of Investigation (KBI). The first instance occurred during the State's direct examination of the witness. While the witness was explaining the general routine of how evidence is received and

processed at the KBI, defense counsel asked to approach the bench and stated, "I'm sorry to interrupt you, Judge, but I thought that I observed [a female juror] falling asleep on the jury." The judge thanked defense counsel and instructed the jury to take a stretch break.

The second instance occurred after the State finished its direct examination of the fire and tool mark examiner and the court took a short recess. Before cross-examination began, defense counsel brought to the court's attention that Armstrong had overheard a conversation between Juror S and Juror Z in the hallway. Armstrong indicated that the topic of conversation concerned his guilt.

The court inquired of each juror separately. The court asked Juror S if he had any conversations about the case with the juror who sat next to him. Juror S denied having any conversations about the case, but he did acknowledge that he had a conversation with Juror Z regarding concrete. Then, the court questioned Juror Z. He said that he might have had a conversation with Juror S, but it was so quick that he did not even remember what it was. When questioned directly about whether they discussed Armstrong's guilt, both jurors denied that the conversation involved the case.

Defense counsel moved for a mistrial based on the fact that one juror was observed sleeping and two jurors were overheard discussing Armstrong's guilt. The court denied the motion. Addressing the issue of the drowsy juror, the trial court noted the issue was addressed in a timely manner and that the juror had been struggling but did not actually nod off. In regard to the conversation between the two jurors, the court noted that both jurors specifically denied discussing Armstrong's guilt, inferring the judge's finding that the jurors' statements were credible.

*Standard of Review*

K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial because of "[p]rejudicial conduct, in or outside the courtroom, [which] makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." Application of this statute requires the trial court to make two inquiries. First, was there a " ' "fundamental failure of the proceeding" ' [Citations

omitted.]?" *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Second, if there was such a failure, is it possible to continue the trial without an " 'injustice,' " meaning did the misconduct deprive the parties of a fair trial? 292 Kan. at 550.

Given the allegations in this case, this means the trial court had to determine (1) whether juror misconduct occurred and (2) if so, whether the misconduct substantially prejudiced Armstrong's right to a fair trial. On appeal, an appellate court reviews the trial court's determination of these two issues under an abuse of discretion standard. 292 Kan. at 550. An abuse of discretion can occur when the trial court makes an error of law, bases the decision on facts not supported by the evidence, or makes a decision that is arbitrary, fanciful, or unreasonable. 292 Kan. at 550. Armstrong contends the trial court's denial of his motion was unreasonable, meaning no reasonable person would agree with the decision. This standard of review is appropriate given the arguments. Nevertheless, because the trial court's ruling is also based on the court's findings of fact, we must consider whether there was substantial competent evidence to support the findings. 292 Kan. at 550.

*Inattentive Juror*

In this case, there is no basis to conclude the trial court erred in finding there was not a fundamental failure in the proceeding because of juror inattentiveness. That is not to say that juror inattentiveness, if sufficiently severe, cannot serve as a basis for a mistrial. See generally, Annot., 59 A.L.R.5th 1, § 2[a] (generally discussing inattention of jurors from sleepiness as ground for reversal or new trial). This court has considered the possibility in several opinions and has routinely held that the purported sleeping of a juror did not warrant a new trial. See, *e.g., State v. Kimmel,* 202 Kan. 303, 305-06, 448 P.2d 19 (1968) (court held defendant failed to show substantial rights were prejudiced where a juror was observed with his eyes closed several times during trial but the defendant was unable to corroborate allegation that juror was asleep); *State v. Jones,* 187 Kan. 496, 499-500, 357 P.2d 760 (1960) (held the defendant failed to show substantial rights were prejudiced where

juror was heard snoring during testimony and the court took a recess so the juror could wake up; the same juror dozed off during final arguments and defense counsel brought it to the court's attention but did not object or move for mistrial); *Dick v. Dick*, 144 Kan. 183, 186, 58 P.2d 1125 (1936) (held it was not error for trial court to overrule motion for new trial, there was testimony in motion hearing that the juror was not asleep but simply relaxing and closing his eyes while listening to testimony).

The facts of this case are most similar to *State v. Kirby*, 272 Kan. 1170, 1196-98, 39 P.3d 1 (2002), where the inattentiveness of two jurors was brought to the attention of the trial court. In addressing the issue, the judge stated, " '[I]t did appear that [the juror] may have nodded off for a moment, and I think we took that appropriate action.' " This court held that the trial court did not abuse its discretion in denying the defendant's motion for a new trial because there was no statement by the juror that he did not hear testimony, the trial court kept a close eye on the juror and took a recess when it appeared that the juror was dozing off, and the length of time the juror dozed was momentary and isolated. 272 Kan. at 1197-98.

Similarly, in this case, although defense counsel stated he "thought" he saw a juror falling asleep, the judge stated, "I think she was struggling a bit, but I don't know that I ever saw her really nod off." Also, there was no evidence the juror did not hear testimony. Further, the trial court took immediate action, and there is nothing in the record to indicate any other incidents during the long trial. Finally, if the juror missed any testimony at all, it was testimony regarding the general procedures used by the fire and tool mark expert and was not specific to the evidence in this case. The trial court took steps to assure the juror was attentive before the expert began to testify about his testing or conclusions regarding the evidence gathered at the scene of Dyer's shooting.

Accordingly, the trial court did not abuse its discretion in determining that the sleeping juror did not substantially prejudice Armstrong's rights and that there was not a fundamental failure in the proceedings warranting a mistrial.

*Conversation of Two Jurors*

Next, Armstrong argues that the two jurors discussing his guilt during a break was a violation of his right to a fair trial because the jurors were discussing the case before the case was submitted to them.

When such an allegation arises at trial, "it is usual practice to question the juror involved in complaints alleging misconduct." *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621, *cert. denied* 493 U.S. 842 (1989), *overruled on other grounds by State v. Rinck*, 260 Kan. 634, 923 P.2d 67 (1996). When inquiry has been made, the trial court has discretion to assess the perceived impact of an allegedly prejudicial event, and an appellate court will give a high degree of deference to the trial court's assessment. *Saucedo v. Winger*, 252 Kan. 718, 731, 850 P.2d 908 (1993). That is especially true when the determination involves a determination of credibility. *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 (2013) ("An appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence.").

Here, both jurors specifically stated that their conversation did not concern Armstrong's guilt or the trial at all. After hearing Armstrong's allegation and the jurors' explanations, the trial court determined the conversation was unrelated to Armstrong's case. This finding was supported by substantial competent evidence. See *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013) ("Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.").

Accordingly, we hold the trial court did not abuse its discretion by finding there was no fundamental error to warrant a mistrial.

## CUMULATIVE ERROR

In his next issue, Armstrong argues the cumulative impact of the trial errors resulted in an unfair trial and his convictions must be reversed.

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a

fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

In assessing the cumulative impact of the errors in this case, we must consider two instances of prosecutorial misconduct and the trial court's failure to give an instruction on the lesser included offense of unintentional but reckless second-degree murder. Because we have applied the constitutional harmless error standard under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), to Armstrong's claims of prosecutorial misconduct, that standard applies to our cumulative error analysis as well. *Tully*, 293 Kan. at 205 (" 'If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' "). Several considerations are relevant to the weighing of whether error was cumulatively harmful, including "how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." 293 Kan. at 205-06.

In this case, there were no remedial efforts relating to the prosecutor's misconduct and the instructional issue arises because the trial court did not *sua sponte* give the instruction. Thus, the errors were not dealt with during the trial.

As to the next factor regarding the number and interrelationship of the errors, we first note that the two misstatements by the prosecutor were unrelated to each other. In fact, one could argue that the second comment—in which the prosecutor acknowledged that the jury could find Armstrong not guilty if it accepted Armstrong's trial testimony—undercuts Armstrong's argument that the first comment—in which the prosecutor indicated the jurors had formed opinions about the case—by illustrating that the prosecutor was not suggesting the jurors should not consider Armstrong's defense. Likewise, neither misstatement relates to Armstrong's claim on appeal that the trial court should have given a lesser included offense instruction on unintentional but reckless second-degree murder. We, therefore, conclude that any prejudice caused by one error did not exacerbate any prejudice caused by another.

As to the final factor—the strength of the evidence—we have already noted that the evidence against Armstrong was not overwhelming. Nevertheless, it was strong, especially in light of the credibility mountain Armstrong had to climb, a mountain he created. As our previous discussion indicates, we have determined beyond a reasonable doubt that the two instances of prosecutorial misconduct, when considered alone, did not affect the verdict. Likewise, the instructional error was not clearly erroneous. Because the errors do not relate to each other, we conclude the strength of the evidence was sufficient to convince us the errors did not cumulatively deprive Armstrong of a fair trial.

## RESTITUTION

Finally, Armstrong challenges the district court's jurisdiction to set the amount for restitution after Armstrong's sentence was imposed.

On June 11, 2009, the sentencing judge ordered Armstrong to consecutive sentences of life imprisonment for premeditated first-degree murder and 11 months' imprisonment for criminal possession of a firearm. The sentencing judge ordered restitution to remain open for 30 days. Defense counsel brought to the judge's attention that holding restitution open for 30 days may be impractical because Williams, Kettler, and Phillips were not going to trial until August. The sentencing judge informed the parties that if longer time was needed the judge would be amenable to a continuation of the hearing. At the end of the hearing, the sentencing judge informed Armstrong that he had 10 days to appeal his convictions and sentences. Armstrong filed his notice of appeal on June 11, 2009, the same day as the sentencing hearing. On September 8, 2009, the sentencing judge held a restitution hearing, with Armstrong present, at which the judge set the amount of restitution.

In arguing this procedure was erroneous, Armstrong requests that this court overturn its holding in *State v. Cooper*, 267 Kan. 15, 18-19, 977 P.2d 960 (1999), that a sentencing judge has discretion to extend the time to set a restitution amount if restitution has been ordered at sentencing. Armstrong argues restitution is part of a defendant's sentence and the amount of restitution must be a

part of that sentence; accordingly, the sentencing judge must pronounce the restitution amount at the time the sentence is imposed and before it loses jurisdiction to alter the sentence.

These arguments were recently resolved in *State v. Hall*, 298 Kan. 978, Syl. ¶ 2, 319 P.3d 506 (2014), where we stated: "A sentencing hearing may be continued or bifurcated so that restitution is ordered at one setting and the amount decided at a later setting. In such instances, a district judge should specifically order the continuance or bifurcation." When continuing a sentencing hearing for the purpose of setting a restitution amount, there are "no magic words" required. Language such as "holding jurisdiction open" for some period or some other variation of that phrase coupled with a later order of an amount certain of restitution, can act as a functional continuance of the defendant's sentencing hearing, at least in cases where the sentencing occurred before the decision in *Hall* was filed. See 298 Kan. at 987.

Here, both parties understood and agreed that the judge was ordering restitution to be held open for 30 days to determine the amount. In addition, everyone understood that the extension might be more than 30 days. Because, at that time, no magic words had to be used in order to continue a sentencing hearing, the language used by the sentencing judge in this case resulted in a functional continuance, preserving subject matter jurisdiction. See, *e.g.*, 298 Kan. at 987 (judge ordered restitution to remain open for 30 days, all parties were agreed that the only issue to resolve at the second hearing was the amount of restitution; this court held that the language used by the judge acted as a functional continuance of the sentencing hearing); *State v. Frierson*, 298 Kan. 1005, 1020-21, 319 P.3d 515 (2014) (judge said he was holding jurisdiction open and the parties agreed to a 30-day extension to reach agreement on the correct amount; held extension was functional continuance, preserving subject matter jurisdiction); *Cooper*, 267 Kan. at 16, 18-19 (judge ordered restitution " 'with that amount to be determined within 30 days' ").

Affirmed.