NOT DESIGNATED FOR PUBLICATION

No. 118,703

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRAYVOND PERCY WALKER III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed March 22, 2019. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn M. Boyd*, assistant county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., LEBEN, J., and KEVIN BERENS, District Judge, assigned.

PER CURIAM: Trayvond Percy Walker III appeals his convictions of aggravated robbery and the criminal use of someone else's credit or debit card. According to witnesses, he had gone up behind two people, put an object into the back of one of them, and demanded their wallets. One of the two turned over her wallet, and Walker used her debit card at a nearby store.

Walker argues that the evidence wasn't sufficient to support an aggravated-robbery charge (aggravated because he used a weapon) because there was no evidence he had a gun. But Kansas law requires only that the defendant have intentionally acted to convince

the victims that he is armed and that the victim reasonably believed it. Both of the people Walker confronted told a responding police officer that they believed he had a gun, so the evidence supported the aggravated-robbery charge.

Walker also argues that the jury instructions were improper in two respects. First, he contends that the court should have given the jury the chance to convict him of the lesser offense of theft instead of aggravated robbery. Theft would be an appropriate charge if Walker had used force *after* taking the victim's wallet, but no evidence suggested that. So the court's decision not to give a lesser-included-offense instruction was correct. Second, Walker argues part of the district court's instruction on the criminal use of another's credit or debit card lessened the required mental culpability to convict from specific intent to defraud to mere knowing use of the card. But Walker didn't object to the instruction at trial, and we reverse in that situation only if we are firmly convinced the error affected the jury's verdict. We cannot make that finding here. The court instructed the jury that the key act—use of the debit card—had to be done "with the intent to defraud." And ample evidence showed that, having committed aggravated robbery to get the card, Walker intentionally committed all acts related to its use. We find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2017, around 11 p.m., Miya Perry drove to Walmart to pick up her brother, Davian, from work and do a little shopping. She parked her car next to a light post towards the middle of the parking lot and went in the store to meet up with Davian. After buying some items, the two left the store.

Miya noticed a truck parked to the right of her car as she and Davian made their way back. When Miya and Davian reached her car, they began loading their bags into the trunk. As they did so, someone came up behind them and ordered them not to move.

2

Miya's first instinct was to turn around, and she saw a man wearing a dark hoodie with the hood up. The man placed something to Davian's back. Miya couldn't see what it was, but she thought she saw a flash of silver. Davian later testified that the item placed against his back kind of felt like a hand, but it felt smaller than the palm. Neither Miya nor Davian saw a gun.

The man then ordered them to hand over their wallets. Miya froze for a second and then gave the man her wallet, with her debit card inside, because "I was scared that me or my brother could get hurt if I didn't." Davian didn't give the man his wallet, explaining he felt "a mixture of disbelief, like panic, and I guess I just thought it was a joke half the time, to be honest."

After Miya gave the man her wallet, he got back in the truck and drove away. Davian saw the silhouette of someone other than the driver in the truck, but he couldn't see well enough to describe that person. Miya thought she saw a shadow in the truck, but she couldn't see a specific person.

Miya then called the police, and Officer Leona Housell from the Leavenworth Police Department responded to the call. Housell spoke with Miya and Davian separately. Miya told the officer a man wearing a dark sweatshirt had gotten out of the truck's driver's side and placed something against Davian's back, which she believed to be a gun. He asked for Miya's wallet, and she gave it to him. He then got back into the truck and left. As he left, she thought she saw another person in the truck. Davian also told Housell he had felt something against his back, and he believed it was a gun. He said the robber was wearing a gray sweatshirt.

After interviewing Miya and Davian, Housell watched the security video from the Walmart parking lot. The video showed a man getting in and out of a large, dark-colored

truck. Housell believed the truck in the video was a Dodge because of the style of the front grill.

Miya and Davian's mother later arrived at the scene. She told the officer that she had checked on Miya's account through a phone app and saw that Miya's card had recently been used at Petro Deli in Lansing. The time stamp from that charge was after Miya had used the card at Walmart. The officer asked someone from the Lansing Police Department to go to Petro Deli to investigate.

Another officer, John Gable from the Lansing Police Department, interviewed the clerk at Petro Deli that night. The clerk told him that a black man wearing a gray sweatshirt had come into the store and purchased diesel fuel and cigarettes with a card. The clerk later testified the man came into Petro Deli and bought a pack of cigarettes with a credit card while fueling a Dodge truck at the pump. He came back a few minutes later and bought two more packs of cigarettes with the card. She remembered him because there was "just something off" about the way he entered the store. She identified Walker as the man in a photo lineup a few days after the robbery and at trial.

Detective Heather Vogel of the Leavenworth Police Department was assigned to investigate the case. She first reviewed the responding officer's report and watched the security videos from both Walmart and Petro Deli. In both videos, she saw a black man in a sweatshirt get out of the driver's side of the same black truck. In the Petro Deli video, she could also see the man's sweatshirt had the number 63 on the front.

Vogel made some still photographs from the Petro Deli video and e-mailed them to Walker's probation officer. The probation officer identified the man in the photos as Walker. The probation officer also told Vogel that Walker worked at Xtreme Clean.

4

Vogel visited Xtreme Clean the day after the robbery. When she arrived, she saw the truck from the security videos parked in the parking lot. Xtreme Clean's owner told Vogel that Walker sometimes worked there, but he didn't have permission to take the truck or to be in the building after hours. The truck's owner also later testified he hadn't given anyone permission to drive the truck after he dropped it off at Xtreme Clean.

Vogel watched security video from Xtreme Clean. In the video, she saw someone wearing the same number 63 sweatshirt inside the shop when no one should have been there. The owner couldn't identify the man in the video, but he later testified the man was wearing shoes like a pair he had given to Walker.

Vogel also interviewed Davian and Miya. Davian said the robber had pressed something hard against his back, but he didn't know what it was. He also told Vogel that he didn't get a good look at the robber, and he didn't give her a description. Davian identified someone in a photo lineup, but it was not Walker. He told Vogel he was 60 to 70 percent sure of his identification.

Miya told Vogel that a man had gotten out of the truck, placed something behind Davian's back, and demanded Miya's wallet. She said the robber was either a black or Hispanic man. She repeated that she thought she saw another person in the truck as it left. Miya also identified someone other than Walker in a photo lineup. She said she was 50 to 55 percent sure of her identification.

A little over a week after the robbery, Walker came to the justice center to find out why officers were looking for him. Walker at first told Vogel he did not know anything about the crimes. He then confessed to taking the truck, going to Walmart, committing the robbery, and then using Miya's card at Petro Deli. He also told Vogel that someone else named Cameron had been with him in the truck. Vogel followed up on this but was never able to find Cameron.

5

The State charged Walker with one count of aggravated robbery, one count of aggravated assault, one count of criminal use of a financial card, and one count of criminal deprivation of property. At the preliminary hearing, the district court dismissed the aggravated assault charge.

At trial, Walker testified in his own defense. He said on the night of the incident he left his girlfriend's house around 11 p.m. to walk to 7-Eleven to get something to drink. Cameron, a "long-time enem[y]" of Walker's, pulled up in a Dodge truck and asked if Walker had any weed. Walker said he didn't but he knew where Cameron could get some and got in the passenger's seat of the truck.

When Cameron later pulled into the Walmart parking lot, Walker asked what they were doing there. Cameron said he had to do something real quick and jumped out of the truck. Walker stayed in the truck and played on his phone. About five minutes later, Cameron got back in and sped off.

As Cameron began driving towards Lansing, he started having chest pains so bad he could not drive. He asked Walker to drive them to a gas station, so Walker drove them to Petro Deli. Cameron gave Walker a credit card and told him to get some gas and cigarettes. Walker paid for the gas and bought two packs of cigarettes with the card. He said he did not know then that the card was stolen.

At some point, Walker asked Cameron where he had gotten the truck. Cameron said he had stolen the truck from Xtreme Clean. Walker became upset because Cameron had stolen from a place that had helped Walker out. The two got in an argument, and Cameron threatened Walker and his family. Walker took the keys from Cameron and returned the truck to Xtreme Clean. But he denied he was the one in the Xtreme Clean security video.

6

Walker said he later turned himself in because he didn't need to run from something he didn't do. He said he then confessed to the crimes because he was scared. Cameron had threatened him and his family, and Walker thought he would be putting his family in jeopardy if he didn't say he was the one who did it.

Walker said he couldn't really describe Cameron—he was "[j]ust a black guy with dreads." He said he hadn't seen Cameron in about seven years before the night of the robbery. Walker testified he thought Cameron's last name was Thompson, even though he told Detective Vogel that he did not know Cameron's last name.

The jury found Walker guilty of aggravated robbery, criminal use of a financial card, and criminal deprivation of property. The district court sentenced Walker to a controlling term of 82 months in prison. Walker appeals.

ANALYSIS

I. *The State Presented Sufficient Evidence to Convict Walker of Aggravated Robbery.*

On appeal, Walker first argues that the State did not produce sufficient evidence to support his conviction for aggravated robbery because there was no proof that he was armed with a dangerous weapon. He also contends the State failed to prove the victims believed he had a dangerous weapon during the robbery. The State responds the evidence showed Walker intended to convince the victims he had a dangerous weapon, and the victims reasonably believed he did.

When a criminal defendant challenges the sufficiency of the evidence supporting a conviction, we look to see whether, after reviewing all the evidence in a light most favorable to the State, we are convinced that a rational fact-finder could have found the

7

defendant guilty beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). In performing this review, we do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. 307 Kan. at 668.

The State charged Walker with aggravated robbery under K.S.A. 2017 Supp. 21-5420(b). To support a conviction, the State had to show Walker knowingly took property from Miya's person or presence by threat of bodily harm to Davian and Miya while being armed with a dangerous weapon. K.S.A. 2017 Supp. 21-5420(b). When determining whether a person is armed with a dangerous weapon, we use a subjective test, meaning we look at how the victim viewed the object. *State v. Holbrook*, 261 Kan. 635, 640, 932 P.2d 958 (1997); *State v. Colbert*, 244 Kan. 422, 425, 769 P.2d 1168 (1989). Under this test, we ask whether the defendant intended to convince the victim that a weapon was dangerous and whether the victim reasonably believed that it was. 244 Kan. at 426.

In support of his argument, Walker cites *Holbrook*, in which the Kansas Supreme Court held that the victim reasonably believed the defendant had a dangerous weapon even though the victim never saw one. 261 Kan. at 638-40. There, the defendant demanded money from a United Postal Service driver delivering a package. When the driver refused, the defendant threatened to shoot him and placed his hand inside his vest. The court found that the defendant did not need to show a weapon to the victim as long as substantial evidence supported a reasonable inference that he was armed. 261 Kan. at 639. The court also held "[t]he robber's conduct and/or statements, if intended to convince the victim that the robber is so armed, along with a reasonable indication by the victim that he or she was so convinced, may be legally sufficient to satisfy this element." *Holbrook*, 261 Kan. at 640.

Walker also cites *State v. Oliver*, 19 Kan. App. 2d 842, 843, 877 P.2d 975 (1994), in which a panel of this court held that a victim does not have to see a weapon to reasonably believe a defendant is armed with a dangerous weapon. There, the victim, a

8

convenience store employee, testified the defendant kept his right hand below the counter at all times. The defendant also threatened to hit the victim with the butt of a gun and to blow the victim's head off. The court held that the defendant's actions, along with his statements, supported a reasonable inference he was armed with a dangerous weapon. 19 Kan. App. 2d at 843-44.

Based on *Holbrook* and *Oliver*, Walker acknowledges the State didn't have to prove Miya and Davian saw an object they believed was a gun to support his conviction. But he argues that unlike those cases, Walker didn't make any statements about a gun. Because of this, he asserts the evidence was not sufficient to support his conviction.

The State argues that this case is more like *State v. Robertson*, 225 Kan. 572, 574, 592 P.2d 460 (1979), in which the Kansas Supreme Court held the defendant's actions and statements were circumstantial evidence that he was armed with a firearm. There, the defendant put his hand in his coat pocket and pointed the pocket toward a store employee. He then said, "'This is serious. It's a robbery I want all your money.'" 225 Kan. at 573. But he never said he had a gun. While the *Robertson* court was reviewing whether the evidence was enough to support an aggravated-robbery charge, not a conviction, a panel of this court has upheld an aggravated-robbery conviction on similar evidence. See *State v. Friesen*, No. 94,284, 2006 WL 1816367, at *4 (Kan. App. 2006) (unpublished opinion) (finding testimony that defendant placed his hand in his pocket and ordered the victim out of his car was enough to support aggravated-robbery conviction).

We conclude that the State's evidence proved the essential elements of aggravated robbery here. While Walker never said he had a gun, his actions and words show he intended for Miya and Davian to believe he had a dangerous weapon, and Miya and Davian reasonably believed he did. Walker approached Miya and Davian at night from behind and placed an object against Davian's back. He told them not to move and demanded their wallets. Miya thought she saw a flash of silver, and she handed over her

wallet because she was afraid Walker might hurt her or her brother. And both Miya and Davian told the responding officer they believed Walker had a gun. While Davian didn't hand over his wallet, that doesn't negate Miya's belief or the statements both Miya and Davian made to the responding officer. When viewed in the light most favorable to the State, the evidence was enough to prove this element of aggravated robbery.

Alternatively, Walker argues that even if the evidence showed Miya and Davian reasonably believed Walker had a gun, the State failed to prove they believed this during the robbery. As Walker correctly notes, robbery requires a threat or use of force either before or during the taking of property. Otherwise, the taking is only a theft. *State v. Bateson*, 266 Kan. 238, Syl. ¶¶ 1, 2, 970 P.2d 1000 (1998). Walker argues the same principle applies to whether a victim reasonably believed a robber was armed with a dangerous weapon. He cites *Colbert*, in which the Kansas Supreme Court held a robber was armed with a dangerous weapon under the subjective test, even though one of the victims realized the robber's gun wasn't loaded after the victims had already handed over money. 244 Kan. at 423, 425. Walker argues that unlike *Colbert*, Davian testified he didn't fully understand they were being robbed until Miya told him what had happened. Walker also points out Miya testified at one point, "I thought maybe [Walker] could hurt me or he could not."

But under the standard of review for a sufficiency challenge, we do not ask whether any evidence in the record could support a finding contrary to the jury's verdict. Nor do we reweigh the evidence. Instead, we ask whether the evidence, when viewed in a light most favorable to the State, is enough to support the conviction rendered by the jury, the fact-finder here. Sufficient evidence supports the jury's verdict: Walker acted as if he had a gun. Miya handed over her wallet because she was scared. Davian didn't because he was panicked and confused. And both told police just after the incident that they believed Walker had a gun.

10

II. *The District Court Did Not Err in Failing to Instruct the Jury That It Could Convict on the Lesser Offense of Theft.*

Next, Walker argues the district court erred when it failed to give an instruction on the lesser-included offense of theft. When a defendant challenges the failure to give a lesser-included-crime instruction on appeal, we apply the analytical framework set out by our Supreme Court for jury-instruction issues. The steps in this framework are (1) determining whether the appellate court lacks jurisdiction to consider the issue or the defendant failed to preserve the issue; (2) determining whether an error occurred; and (3) determining whether the error was harmless or requires reversal. *State v. Dupree*, 304 Kan. 377, 391-92, 373 P.3d 811 (2016).

Walker concedes he didn't request a theft instruction. This changes the reversibility analysis in the third step. We first must decide whether an error occurred at all. To do this, we ask whether the unrequested lesser-included instruction was legally and factually appropriate. If we find that no error occurred, the analysis ends. *State v. Armstrong*, 299 Kan. 405, 432-33, 324 P.3d 1052 (2014).

First, for a theft instruction to be legally appropriate, theft must be a lesser-included crime of aggravated robbery. See *Armstrong*, 299 Kan. 405, Syl. ¶ 5. The Kansas Supreme Court has held that theft by obtaining unauthorized control over property is a lesser-included crime of robbery and aggravated robbery, *State v. Sandifer*, 270 Kan. 591, 600, 17 P.3d 921 (2001), so a theft instruction thus was legally appropriate.

Next, we must decide whether a theft instruction was factually appropriate. For an instruction on a lesser-included crime to be factually appropriate, evidence in the record, along with reasonable inferences drawn from that evidence, must reasonably support a

11

conviction for the lesser crime. *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012); see K.S.A. 2018 Supp. 22-3414(3).

Here, a theft instruction wasn't factually appropriate. As we have noted, the difference between theft and robbery is the timing of any threat or force in relation to the taking of property. If the threat or force occurs before or during the taking, it's robbery. If it occurs after the taking, it's theft. See *Bateson*, 266 Kan. 238, Syl. ¶¶ 1, 2.

For instance, in *State v. Plummer*, 295 Kan., 156, 168, 283 P.3d 202 (2012), the Kansas Supreme Court held that the district court erred in failing to give a theft instruction in an aggravated-robbery trial. There, the defendant placed store merchandise in his pockets and backpack before walking past the cashiers without paying. A store security officer stopped the defendant before he could leave the store, and the two got into a scuffle. The court held the district court should have given a theft instruction because the evidence could support a finding that the defendant had completed the theft (by walking past the cashiers) before he used force. 295 Kan. at 168.

Unlike *Plummer*, the evidence here shows Walker's use of force occurred before he took Miya's wallet. No evidence suggests otherwise. And Walker's defense wasn't that there was some factual dispute about when he used force—his defense was that he simply wasn't the robber. As a result, the evidence doesn't support a theft conviction, and the district court didn't err in failing to give a theft instruction.

III. *The District Court Did Not Improperly Instruct the Jury on the Requisite Culpable Mental State for Criminal Use of a Financial Card of Another.*

Walker raises one other issue about the jury instructions—that the court's instruction was incorrect on the required mental state for the criminal use of a financial card of another. Walker didn't object to the challenged instruction, so we cannot reverse

12

the jury's verdict unless he can show the giving of the instruction was clearly erroneous. See K.S.A. 2018 Supp. 22-3414(3); *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). Once again, we first consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). If we determine that the instruction was erroneous, we reverse the jury's verdict if we are firmly convinced the jury would have reached a different verdict without it. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

Although Walker acknowledges that he didn't object to the district court's jury instruction on this point, he nonetheless argues that we shouldn't apply the clear-error analysis because the instructional error involves his state and federal constitutional rights to a jury trial. But Walker can't change the standard to be applied on this point by characterizing the issue as a constitutional one. See *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012). Even an instruction that omits an element of an offense is still subject to clear-error review when the defendant doesn't object at trial. *State v. Jarmon*, 308 Kan. 241, 244, 419 P.3d 591 (2018).

The district court gave this instruction on the elements of criminal use of a financial card of another:

"The defendant is charged with criminal use of a financial card of another. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. The defendant used a USAA financial card.
"2. The cardholder, [Miya], had not consented to the use of the financial card by the defendant.
"3. The defendant used the financial card for the purpose of obtaining property.
"4. The defendant did so with the intent to defraud.
"5. The financial card was unlawfully used in the total amount of less than $1,000.

13

"6. This act occurred on or about the 14th day of February, 2017, in Leavenworth County, Kansas.

"The State must prove that the defendant committed the crime of criminal use of a financial card of another, knowingly. A defendant acts knowingly when the defendant is aware of the nature of the defendant's conduct that the State complains about."

For this instruction to be legally appropriate, it must fairly and accurately state the law. *Plummer*, 295 Kan. at 161.

The State charged Walker under K.S.A. 2017 Supp. 21-5828(a)(1). That statute defines criminal use of a financial card as using a financial card without the consent of the cardholder with the intent to defraud and obtain money, goods, property, or services. All crimes with a culpable mental state of "with intent" are specific-intent crimes. K.S.A. 2017 Supp. 21-5202(h). Because criminal use of a financial card is a specific-intent crime, the district court erred when it told the jury the State needed only to prove that Walker committed the crime knowingly. See *State v. Silverson*, No. 117,047, 2018 WL 3404080, at *4 (Kan. App. 2018) (unpublished opinion) (holding district court erred in instructing jury to apply knowing culpable mental state to a specific-intent crime).

Because an error occurred, we must decide whether it was clear error requiring that we reverse the jury's verdict. We reverse under the clear-error standard only if Walker can firmly convince us that the jury would have reached a different verdict without the error. We cannot make that finding here.

While the challenged instruction told the jury the State must prove Walker committed the crime knowingly, it also told the jury Walker must have used Miya's card with the intent to defraud. This is the only element the State had to prove that Walker committed intentionally. K.S.A. 2017 Supp. 21-5202(g) ("If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element

14

or elements . . . ."). And "'[i]ntent' is a widely used term that is readily comprehensible and needs no further defining instruction." *Silverson*, 2018 WL 3404080, at *5. So it is unlikely that the instructions confused the jury, leading it to convict Walker based on a finding that he only knowingly defrauded Miya.

Additionally, ample evidence supports Walker's conviction on this charge. Petro Deli's security video showed Walker using Miya's card to purchase cigarettes. The clerk testified that Walker bought cigarettes and gas with the card. Walker also confessed to Vogel that he robbed Miya at Walmart and used her card at Petro Deli. Admittedly, Walker later testified that he had lied to Vogel, stating someone else had committed the robbery and that he didn't know Miya's card was stolen when he used it. But the jury didn't find Walker credible—it convicted him on all charges. And no rational jury could find Walker committed aggravated robbery when he stole Miya's wallet and also find he didn't intend to defraud her when he used her debit card.

We affirm the district court's judgment.