NOT DESIGNATED FOR PUBLICATION

No. 124,147

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JESSE D. DOLL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sumner District Court; WILLIAM R. MOTT, judge. Opinion filed December 16, 2022. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., HURST, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM: This appeal arises from Jesse Dean Doll's innovative challenge to his convictions for reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm. Doll argues the jury erred in finding his conduct met the elements of both crimes, resulting in mutually exclusive convictions. Finding that the crimes of reckless aggravated battery and leaving the scene of an injury accident are not mutually exclusive, this court affirms Doll's convictions.

1

FACTUAL AND PROCEDURAL BACKGROUND

This case stems from an incident the evening of February 6, 2020, at the business of K Doll Koatings, which was owned and operated by Jesse Doll's father, Kevin Doll. On that night, Jesse and his wife, Stephanie Doll, went to dinner at Jesse's parents' house where Jesse and Stephanie's three children had been staying. Jesse and Stephanie finished dinner and left around 8:20 p.m., and sometime before leaving, Stephanie told one of her children, "I don't know when we'll be back to visit you because we don't have any fuel for the pickup."

At about 8:45 p.m. that same evening, Ron Heimerman arrived at K Doll Koatings to check on the semi-trucks that he was storing, with Kevin's permission, on the business' land. Sometime before, and then again on February 2, 2020, Ron had noticed that fuel was missing from his trucks stored at K Doll Koatings. Ron suspected that someone was stealing the diesel fuel, and in an attempt to thwart future theft he began sleeping in one of his semi-trucks a few nights a week. Ron also set up a motion-sensor trail camera aimed at one of the semi-trucks that had captured images of what appeared to be a man driving a dark truck standing near the semi-trucks carrying a large gas can and hose. But the exact date and time those images were taken could not be confirmed at trial.

On February 6, 2020, Ron again planned to sleep in one of his semi-trucks and pulled his vehicle into the opposite side of the lot in an attempt to conceal its presence from anyone who might approach the semi-trucks. While still inside of his regular vehicle, Ron noticed a vehicle pull in and park behind him with its headlights shining through Ron's back window. Ron testified that he got out of his vehicle, walked up to the driver's side door of the vehicle that parked behind him, and recognized the driver as Jesse and the passenger as Stephanie. Ron testified that Jesse and Stephanie were in a black four-door Chevy diesel truck, and when Ron approached the truck, he "smelled diesel fuel bad."

Ron testified that he asked Jesse what he was doing at K Doll Koatings that night, and Jess said he was there to get pallets from the lot. Ron testified that he told Jesse he should get those pallets in the daylight hours because "we got some problems out here." Ron testified that he saw one pallet in the bed of Jesse's truck—and Jesse then reversed his truck and moved to another part of the K Doll Koatings lot and Ron followed him.

While Ron and Jesse were both parked at their new locations in the lot, Ron testified that he exited his vehicle and noticed that the fuel caps were off both of his semi-trucks, even though he had made sure the caps were on that morning. Ron also testified that there was diesel fuel "all over the ground," which he found to be significant because his gas tanks did not have any leaks. It was at this time that Ron said he noticed Jesse's truck was leaving the K Doll Koatings lot and Ron ran up to it.

According to Ron's trial testimony, when he approached the truck Jesse said, "Now what?" and Ron responded, "This ain't over." Ron testified that Jesse then "flipped [him] off with both hands," said "FU," and then turned his truck in a quick circle and started coming toward Ron at about 20 or 25 miles per hour. Ron testified that he was standing "right in the middle" of the truck as it approached, but he jumped to the side and the driver's side mirror hit him in the shoulder and knocked him down. Once on the ground, Ron said the truck ran over his leg and Jesse circled back to where Ron was lying on the ground.

Ron testified that Jesse circled back, stopped the truck, and exited from the driver's side, and Ron yelled at Jesse to call an ambulance because his leg was broken. Rather than call an ambulance, Ron testified that Jesse "started punching [him] in the face" and said that he "ought to kill [him]." Ron testified that Jesse punched him four or five times before Stephanie got out of the truck and yelled at Jesse to stop and "[l]et Ron go." According to Ron, Jesse stopped hitting him and Jesse and Stephanie got back into their

3

truck and left the K Doll Koatings lot. Ron testified that he then used his elbows to crawl back to his vehicle—approximately 75 yards away—to get his phone and call for help.

Ron testified that he called Kevin Doll at 9:55 p.m. to come to the lot because he had a broken leg. Ron testified that he drank a couple of beers while waiting for Kevin because he was in pain, and after Kevin arrived Ron asked Kevin to put the fuel caps back on his semi-trucks because of the possibility of rain. After Kevin helped Ron into his truck and began driving him to the hospital, Kevin called 9-1-1 to report the incident. Once at the hospital, Ron spoke with the sheriff and another law enforcement officer who took photos of Ron that showed a cut on his lower lip, cuts on both of his hands, a cut on his knee, and his slightly swollen left leg. Ron was transferred to a different Wichita area hospital where he remained hospitalized for six days, and he testified that he had surgery to place a rod and screws in his leg. After being released, Ron testified that he had to use a walker for two months and then crutches for a period of time.

Jesse did not testify at trial, but his wife Stephanie did and recounted the events at K Doll Koatings differently than Ron. Stephanie testified that after she and Jesse had dinner at his parents' house, they went to their house a couple of minutes away to unload the back of their truck. While at home, they ran into an acquaintance, B.P. (who did not testify), and after about 15 minutes at home all three left to get pallets from K Doll Koatings. She testified that B.P. drove them all in Jesse and Stephanie's truck, while she and Jesse rode in the passenger seat.

After arriving at K Doll Koatings, Stephanie testified that the three of them had just started to load pallets into the truck when they noticed a vehicle pull into the lot and turn off its lights. Stephanie testified that the three then got into their truck and pulled up behind the vehicle to see who it was, then she and Jesse exited the passenger side of their truck, approached the vehicle, and saw Ron exit the driver's side of his vehicle. Stephanie testified that Ron walked in a circle around their truck and Jesse and Ron had a brief

4

conversation where Ron did not say much. Stephanie said that she, Jesse, and B.P. then went back to finish loading the pallets.

After they finished loading the pallets, Stephanie testified that the three of them were about to drive off the lot when they saw Ron walking between the two semi-trucks and trying to say something to them. She testified that B.P. backed the truck up and then Jesse asked Ron what he had said, and Ron responded that "[t]his isn't over. I will get you. This is not over." Stephanie testified that Jesse laughed off Ron's comment, B.P. did a "doughnut-type thing" when turning around to leave, and as they left, she saw Ron walking toward the truck and sticking his hands out at the truck in a "hit me demeanor." According to Stephanie, as B.P. pulled out of the lot, Ron's hand "slap[ped] the passenger side mirror" and it made Ron "spin and fall." Stephanie testified she saw Ron fall and then lift his upper body as if he were getting up, and she did not hear Ron scream, yell, or say anything after he fell. Stephanie testified that the three of them continued to drive and left the lot without any further encounter or incident.

Based on these events, the State charged Jesse with theft, knowing aggravated battery, simple battery, reckless driving, leaving the scene of an injury accident resulting in great bodily harm, and criminal threat. A jury convicted Jesse on all counts except for knowing aggravated battery—and instead found Jesse guilty of the lesser charge of reckless aggravated battery. The district court sentenced Jesse to a controlling term of 76 months in prison. Jesse timely appealed.

DISCUSSION

On appeal, Jesse only challenges his convictions for reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm—claiming that the two crimes are mutually exclusive. Essentially, he argues that if he committed the

5

elements of one crime, then he necessarily could not have committed the elements of the second crime.

*Preservation and Standard of Review for Mutual Exclusivity Challenges*

Although Jesse did not object at the trial court level that his convictions for the two crimes were mutually exclusive, this court may address Jesse's challenge for the first time on appeal. Mutual exclusivity challenges are akin to arguments challenging the sufficiency of the evidence and "are not constrained by a preservation requirement" for appeals purposes. See *State v. Chavez*, 310 Kan. 421, 425, 447 P.3d 364 (2019) (classifying defendant's argument that the stalking statute required a finding of mutually exclusive mental culpability as a sufficiency challenge not requiring preservation below).

The parties disagree about the nature of Jesse's appeal, and thus the applicable standard of review. The State incorrectly characterizes the appeal as a challenge to the jury instructions, but the appellant's brief only passingly mentions jury instructions. It is clear that Jesse argues that his convictions for reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm are mutually exclusive. "Whether convictions are mutually exclusive is a legal question subject to de novo review." *State v. Salazar-Moreno*, No. 119,702, 2020 WL 1814321, at *3 (Kan. App. 2020) (unpublished opinion). To the extent this analysis requires this court to interpret statutes, statutory interpretation is a question of law also subject to de novo review. See *Chavez*, 310 Kan. at 425-26.

*Reckless Aggravated Battery and Leaving the Scene of an Injury Accident Resulting in Great Bodily Harm are not Mutually Exclusive Crimes*

Jesse argues that his convictions are mutually exclusive because they each require a different legal intent or mens rea. Jesse claims that a conviction for reckless aggravated

battery requires a finding that he acted with a reckless intent, whereas a conviction for leaving the scene of an injury accident requires that he acted accidentally—not recklessly or intentionally. Although Kansas criminal statutes do not define the term "accident," Jesse argues that the definition of "reckless" does not explicitly include accidental conduct and Kansas courts have treated the term "accident" more narrowly when analyzing insurance disputes in auto accidents. Simply put, Jesse argues that if he were convicted of *recklessly* hitting Ron with the truck, then the conduct was not *accidental* and thus Ron could not simultaneously be convicted of leaving the scene of an *accident*. Although innovative and zealous, this argument lacks legal support.

Although Kansas Supreme Court authority addressing mutually exclusive verdicts is limited, the law is not helpful to Jesse. See *State v. Williams*, 308 Kan. 1439, 1449-50, 430 P.3d 448 (2018) (where the court adopted the North Carolina Supreme Court's elements approach to analyzing whether verdicts are mutually exclusive). In *Williams*, the court explained that

> "[m]utually exclusive verdicts include: (1) those that are a legal impossibility, such as guilty verdicts on both a greater and its lesser included offense and (2) those that purport to establish a defendant's guilt for two separate and distinct criminal offenses, the nature of which are such that guilt of one necessarily excludes guilt of the other—that is, when a conviction as to one of the crimes negates an element of the other." 308 Kan. 1439, Syl. ¶ 3.

The *Williams* court ultimately rejected the defendant's argument that his convictions for aggravated burglary and domestic battery were mutually exclusive because the elements of each crime did not negate each other, and therefore it was legally possible for the defendant to be convicted of both crimes. 308 Kan. at 1449-50. Thus, the first step in the mutual exclusivity analysis requires a comparison of the elements of Kansas statutes for reckless aggravated battery (K.S.A. 2019 Supp. 21-5413[b][2][A]) and for leaving the

7

scene of an injury accident resulting in great bodily harm (K.S.A. 2019 Supp. 8-1602[b][3]).

Reckless aggravated battery is "recklessly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2019 Supp. 21-5413(b)(2)(A). A person acts "recklessly" when they consciously disregard "a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j). The jury instruction at Jesse's trial provided:

> "To establish this charge, each of the following claims must be proved:
> 1. The defendant recklessly[1] caused great[2] bodily harm to [Ron].
> 2. This act occurred on or about the 6th day of February, 2020, in Sumner County, Kansas.
>
> "[1]A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that great bodily harm to another person will be the result of defendant's actions.
>
> "[2]The word 'great' distinguishes the bodily harm necessary from slight, trivial, minor, or moderate harm."

A driver involved in an accident violates the law by failing to immediately stop and remain at the scene because

> "[t]he driver of any vehicle involved in an accident resulting in injury to, great bodily harm to or death of any person . . . shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible, but shall then immediately return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of K.S.A. 8-1604, and amendments thereto." K.S.A. 2019 Supp. 8-1602(a).

Additionally, as required by K.S.A. 2019 Supp. 8-1604, the driver of any vehicle involved in an accident resulting in injury to another person is required to render reasonable assistance to the injured person. Reasonable assistance may include making "arrangements for the carrying of such person" for medical treatment when the need is apparent or upon the injured person's request. See K.S.A. 2019 Supp. 8-1604(a)(2). The jury instruction provided at Jesse's trial for this charge read:

> "To establish this charge, each of the following claims must be proved:
> 1. The defendant was the driver of a vehicle involved in an accident.
> 2. The accident resulted in great[1] bodily harm to a person.
> 3. The defendant failed to immediately stop at the scene of the accident and remain until he had rendered reasonable assistance to the injured person when it was apparent that medical treatment was necessary or when the injured person requested the defendant to call an ambulance for transport to a medical facility.
> 4. This act occurred on or about the 6th day of February, 2020, in Sumner County, Kansas.
>
> "[1]The word 'great' distinguishes the bodily harm necessary from slight, trivial, minor, or moderate harm."

Essentially, Jesse argues that because the jury found he acted recklessly when he struck Ron with the mirror of his truck, then his actions could not also have been an accident. The State disagrees, noting that Jesse's conviction for leaving the scene of an injury accident causing great bodily harm merely required that he was "involved in an accident," not that the collision resulted from purely accidental conduct.

Under the elements approach adopted in *Williams*, the crimes of reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm are not mutually exclusive as the elements of each crime do not negate each other. It is legally possible for Jesse to be convicted of both crimes. See *Williams*, 308 Kan. at

9

1449-50. In finding Jesse guilty of reckless aggravated battery, the jury found that Jesse recklessly caused Ron bodily harm because Jesse "consciously disregard[ed] a substantial and unjustifiable risk that great bodily harm to another person w[ould] be the result" of his conduct. This crime did not require Jesse to act intentionally—but merely recklessly—with a disregard for substantial and unjustifiable risk.

The jury also found Jesse guilty of leaving the scene of an injury accident resulting in great bodily harm because, despite Stephanie's testimony to the contrary, he was the driver of the truck that was "involved in an accident," that "accident resulted in great bodily harm" to Ron, and Jesse failed to "render reasonable assistance" to Ron. The jury was not given a definition of the term "accident," and there is no definition within the relevant criminal statute, but it is a commonly understood word—particularly in the context of what is commonly referred to as a car accident. The trial court is not required to define every word or phrase in the jury instructions. "It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined. A term which is widely used and which is readily comprehensible need not have a defining instruction. [Citations omitted.]" *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979); see *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014). Additionally, Black's Law dictionary defines "accident" as:

> "An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated; any unwanted or harmful event occurring suddenly, as a collision, spill, fall, or the like, irrespective of cause or blame." Black's Law Dictionary 18-19 (11th ed. 2019).

A "car accident" is defined as "[a]n accident in which a motor vehicle collides with another vehicle or with a person, animal, or object, usu. causing damage or injury." Black's Law Dictionary 19 (11th ed. 2019).

10

The Black's Law Dictionary definitions of "accident" and "car accident" are consistent with the common understanding of those terms. Neither the cited definitions, nor the common understanding of the word "accident," preclude recklessness from causing or contributing to an accident. A person may be *involved in an accident* that results from reckless conduct. Jesse's reliance on insurance caselaw to argue to the contrary is misplaced when insurance policies may provide different coverage or results based on the driver's culpability and include contractual definitions. It was legally possible for the jury to find that Jesse satisfied each element of reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm without any element of one crime negating an element of the other. See *Williams*, 308 Kan. at 1449-50. Moreover, there was more than enough evidence to support the jury's finding as to each element of each crime.

CONCLUSION

Jesse Doll's convictions for the two separate, distinct crimes of reckless aggravated battery and leaving the scene of an injury accident resulting in great bodily harm were not mutually exclusive and are thus both affirmed.

Affirmed.

11